# EXHIBIT B-1

ORIGINAL

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|

Roman Silberfeld, Bar No. 62783
Lucas A. Messenger, Bar No. 217645
ROBINS KAPLAN LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067
TELEPHONE NO.: 310-552-0130   FAX NO.: 310-229-5800
ATTORNEY FOR *(Name)*: Plaintiffs City of El Monte and People of the State of California

FILED
Superior Court of California
County of Los Angeles

MAR 28 2019

Sherri R. Carter, Executive Officer/Clerk of Court
By Brigitte De La Rosa, Deputy
Brigitte De La Rosa

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME: City of El Monte, et al. v. Purdue Pharma L.P., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: 19STCV10532 |
|---|---|---|---|---|
| [X] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[X] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [X] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [X] Large number of separately represented parties
   b. [X] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [X] Substantial amount of documentary evidence
   d. [X] Large number of witnesses
   e. [X] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [X] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [X] monetary b. [X] nonmonetary; declaratory or injunctive relief c. [X] punitive

4. Number of causes of action *(specify)*: nine

5. This case [ ] is [X] is not a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 27, 2019

Roman Silberfeld, Bar No. 62783
(TYPE OR PRINT NAME)                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal Solutions Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you must complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach—Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case—Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief from Late Claim
  Other Civil Petition



| SHORT TITLE City of El Monte, et al. v. Purdue Pharma L.P. | CASE NUMBER 19STCV10532 |

# CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

> **Applicable Reasons for Choosing Court Filing Location (Column C)**

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.

7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).



| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons -<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100 Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110 Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/ Property Damage/ Wrongful Death Tort** | Asbestos (04) | ☐ A6070 Asbestos Property Damage | 1, 11 |
| | | ☐ A7221 Asbestos - Personal Injury/Wrongful Death | 1, 11 |
| | Product Liability (24) | ☐ A7260 Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210 Medical Malpractice - Physicians & Surgeons | 1, 4, 11 |
| | | ☐ A7240 Other Professional Health Care Malpractice | 1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250 Premises Liability (e.g., slip and fall) | 1, 4, 11 |
| | | ☐ A7230 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.) | 1, 4, 11 |
| | | ☐ A7270 Intentional Infliction of Emotional Distress | 1, 4, 11 |
| | | ☐ A7220 Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 1 of 4

LA-CV109

| SHORT TITLE: City of El Monte, et al. v. Purdue Pharma L.P. | CASE NUMBER | |
|---|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | [X] A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | [ ] A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | [ ] A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | [ ] A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | [ ] A6017  Legal Malpractice | 1, 2, 3 |
| | | [ ] A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | [ ] A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | [ ] A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | [ ] A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | [ ] A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06)<br>(not insurance) | [ ] A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | [ ] A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | [ ] A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | [ ] A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | [ ] A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | [ ] A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | [ ] A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | [ ] A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | [ ] A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | [ ] A6031  Tortious Interference | 1, 2, 3, 5 |
| | | [ ] A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | [ ] A7300  Eminent Domain/Condemnation      Number of parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | [ ] A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | [ ] A6018  Mortgage Foreclosure | 2, 6 |
| | | [ ] A6032  Quiet Title | 2, 6 |
| | | [ ] A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | [ ] A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | [ ] A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | [ ] A6020F  Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | [ ] A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

| SHORT TITLE: City of El Monte, et al. v. Purdue Pharma L.P. | | CASE NUMBER | |
| --- | --- | --- | --- |

| | **A**<br>Civil Case Cover Sheet<br>Category No. | **B**<br>Type of Action<br>(Check only one) | **C** Applicable<br>Reasons - See Step 3<br>Above |
| --- | --- | --- | --- |
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

| SHORT TITLE: City of El Monte, et al. v. Purdue Pharma L.P. | CASE NUMBER |
|---|---|

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON: <br> □1. ☒2. □3. □4. □5. □6. □7. □8. □9. □10. □11. | ADDRESS: Stanley Mostk Courthouse <br> 111 North Hill Street <br> Los Angeles, CA 90012 |
|---|---|
| CITY: Los Angeles | STATE: CA | ZIP CODE: 90012 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the <u>Central</u> District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: <u>March 27, 2019</u>

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)
Roman Silberfeld

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

1  **Robins Kaplan LLP**
   Roman Silberfeld, Bar No. (62783)
2  RSilberfeld@RobinsKaplan.com
   Bernice Conn, Bar No. (161594)
3  BConn@RobinsKaplan.com
   Michael A. Geibelson, Bar No. (179970)
4  MGeibelson@RobinsKaplan.com
   Lucas A. Messenger, Bar No. (217645)
5  LMessenger@RobinsKaplan.com
   2049 Century Park East, Suite 3400
6  Los Angeles, CA  90067
   Telephone:   310 552 0130
7  Facsimile:   310 229 5800

8  **Office of the City Attorney for El Monte**
   Rick Olivarez, Bar No. (195770)
9  rolivarez@omlolaw.com
   500 S Grand Ave, Floor 12
10 Los Angeles, CA 90071
   Telephone:   213 744 0099
11 Facsimile:   213 744 0093

12 Attorneys for Plaintiffs City of El Monte and The
   People of the State of California
13
   (NO FEE – Cal. Gov. Code § 6103)
14

15            SUPERIOR COURT OF THE STATE OF CALIFORNIA

16                        COUNTY OF EL MONTE

17

18 CITY OF EL MONTE; and THE PEOPLE        Case No. **19STCV10532**
   OF THE STATE OF CALIFORNIA, by
19 and through El Monte City Attorney Rick
   Olivarez,                               **PLAINTIFFS' COMPLAINT FOR:**
20
                Plaintiffs,                **1. PUBLIC NUISANCE;**
21
          v.                              **2. FRAUD;**
22
   PURDUE PHARMA L.P.; PURDUE             **3. NEGLIGENCE;**
23 PHARMA INC.; THE PURDUE
   FREDERICK COMPANY; RICHARD S.          **4. UNJUST ENRICHMENT;**
24 SACKLER, an individual and as trustee for
   TRUST FOR THE BENEFIT OF                **5. CIVIL CONSPIRACY;**
25 MEMBERS OF THE RAYMOND
   SACKLER FAMILY; JONATHAN D.            **6. FALSE ADVERTISING;**
26 SACKLER, an individual and as trustee for
   TRUST FOR THE BENEFIT OF                **7. NEGLIGENT FAILURE TO WARN;**
27 MEMBERS OF THE RAYMOND
   SACKLER FAMILY; MORTIMER D.A.          **8. FRADULENT TRANSFER; and**
28 SACKLER, an individual; KATHE A.

ORIGINAL

FILED
Superior Court of California
County of Los Angeles

MAR 2 8 2019

Sherri R. Carter, Executive Officer/Clerk of Court
By _Brigitte De La Rosa_ Deputy
   Brigitte De La Rosa



ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108 1

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  SACKLER, an individual; IRENE
SACKLER LEFCOURT, an individual;
2  BEVERLY SACKLER, an individual and
as trustee for TRUST FOR THE BENEFIT
3  OF MEMBERS OF THE RAYMOND
SACKLER FAMILY; THERESA
4  SACKLER, an individual; DAVID A.
SACKLER, an individual; CEPHALON,
5  INC.; TEVA PHARMACEUTICAL
INDUSTRIES, LTD.; TEVA
6  PHARMACEUTICALS USA, INC.;
JANSSEN PHARMACEUTICALS, INC.;
7  JOHNSON & JOHNSON; ORTHO-
MCNEIL-JANSSEN
8  PHARMACEUTICALS, INC.; JANSSEN
PHARMACEUTICA. INC.; ENDO
9  HEALTH SOLUTIONS INC.; ENDO
PHARMACEUTICALS INC.; ACTAVIS
10  PLC; WATSON PHARMACEUTICALS,
INC.; WATSON LABORATORIES, INC.;
11  ACTAVIS PHARMA, INC.; ACTAVIS
LLC; ALLERGAN PLC; ALLERGAN.
12  INC.; ALLERGAN USA, INC.; INSYS
THERAPEUTICS, INC.;
13  MALLINCKRODT, PLC;
MALLINCKRODT, LLC; CARDINAL
14  HEALTH, INC.;
AMERISOURCEBERGEN
15  CORPORATION; MCKESSON
CORPORATION; and
16  DOES 1-100, inclusive,

17           Defendants.

18

19

20

21

22

23

24

25

26

27

28

9.  **CIVIL CONSPIRACY**

61526108.1

COMPLAINT

# Table of Contents

I.    INTRODUCTION .................................................................................. 1

II.   THE PARTIES ...................................................................................... 3

    A.    The Plaintiffs ............................................................................ 3

    B.    The Manufacturer Defendants.................................................. 3

    C.    The Distributor Defendants .................................................... 10

    D.    The Doe Defendants............................................................... 11

III.  JURISDICTION AND VENUE ......................................................... 12

IV.  GENERAL FACTUAL ALLEGATIONS........................................... 12

    A.    An Overview of the Opioid Epidemic ................................... 12

    B.    The Manufacturer Defendants Spread False or Misleading Information About the Safety of Opioids........................................................... 16

        1.    The Manufacturer Defendants Engaged in False and Misleading Direct Marketing of Opioids...................................................... 19

        2.    The Manufacturer Defendants Used Detailing and Speaker Programs to Spread False and Misleading Information About Opioids.............................................................................. 19

        3.    The Manufacturer Defendants Deceptively Marketed Opioids through Seemingly Independent Third Parties that Disseminated Unbranded Advertising Created by the Manufacturer Defendants 22

    C.    The Manufacturer Defendants' Statements about the Safety of Opioids Were Patently False................................................................. 31

    D.    The Manufacturer Defendants Misrepresented the Benefits of Chronic Opioid Therapy ......................................................................... 44

    E.    All Defendants Created an Illicit Market for Opioids.............. 54

        1.    The Distributor Defendants Negligently Failed to Control the Flow of Opioids to El Monte Through Illicit Channels ..................... 58

        2.    The Manufacturer Defendants Negligently Failed to Control the Flow of Opioids to El Monte Through Illicit Channels ............. 64

    F.    The Defendants Knowingly Profit from an Interstate Opioid Crisis ..... 65

    G.    Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages.................................... 70

    H.    The Impact of Opioid Abuse on El Monte.............................. 72

    I.    The Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses...................................... 78

V.   FACTS PERTAINING TO DEFENDANTS' CONSPIRACY ......................... 80

    A.    The Marketing Scheme .......................................................... 80

    B.    The Distribution Scheme........................................................ 84

VI.  MISCELLANEOUS FACTUAL ALLEGATIONS ........................... 86

VII.  CAUSES OF ACTION ....................................................................... 88

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

-i-

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## I.    INTRODUCTION

1.      An epidemic of prescription opioid abuse is devastating the United States. Plaintiff City of El Monte (hereinafter, "El Monte") has been particularly hard hit, causing El Monte to suffer substantial loss of resources, economic damages, and damages to the health and welfare of its citizens.

2.      El Monte, California, by and through its attorneys hereto and its City Attorney, hereby brings this action on its own behalf for injuries suffered and on behalf of the People of the State of California (the "People," and together with El Monte, "Plaintiff") to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance.

3.      Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid addiction and overdose deaths.[1] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[2]

4.      This epidemic has been building for years. The conditions for its creation and acceleration were intentionally brought about by Defendants, who made billions of dollars off the epidemic.

5.      The effects of the opioid epidemic and resulting health care crisis have been exacerbated by Defendants' efforts to conceal or minimize the risks of opioid abuse, while at the same time circumventing or ignoring any safeguards against opioid abuse.

6.      El Monte has seen increased costs of, among other things, (a) medical and therapeutic care, and other treatment costs for patients suffering from opioid addiction, overdose, or death; (b) counseling, treatment and rehabilitation services; (c) treatment of infants born with opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer from opioid-related disability or incapacitation, including costs of related legal proceedings; (e) public safety connected to the opioid epidemic within El Monte, including police, emergency

---

[1] See Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).
[2] See Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

response services, and detention centers; (f) increased burden on El Monte's code enforcement programs; (g) re-education of doctors and patients about the appropriate use of opioids; and (h) extensive clean-up of public parks, spaces, and facilities. At the same time, El Monte has seen a reduction to tax revenues caused by the epidemic created by the Defendants. Almost every citizen of El Monte has been affected. The resulting damage to El Monte was directly and foreseeably caused by Defendants' actions.

7. These increased costs could have been—and should have been—prevented by the opioid industry. Defendants controlled the manufacture, marketing, and distribution of prescription opioids. As such Defendants, and not Plaintiff, were in the best position to protect Plaintiff from the risk of harm stemming from misuse of these products. Defendants owed Plaintiff a duty of care to act reasonably in light of that potential harm. The opioid industry also is required by statute and regulation to secure and monitor opioids at every step of the stream of commerce, thereby protecting opioids from theft, misuse, and diversion.

8. Instead of acting with reasonable care and in compliance with their legal duties, Defendants intentionally flooded the market with opioids and pocketed billions of dollars in the process.

9. At the same time, Defendants flooded the market with false statements designed to persuade both doctors and patients that prescription opioids posed a low risk of addiction. Those claims were false.[3]

10. Defendants' actions have not only caused significant costs, but have also created a palpable climate of fear, distress, dysfunction and chaos among El Monte residents where opioid diversion, abuse, and addiction are prevalent and where diverted opioids tend to be used frequently.

11. Plaintiff also seeks the means to abate the epidemic created by Defendants' wrongful and/or unlawful conduct.

---

[3] *See* Vivek H. Murthy, *Letter from the Surgeon General* (August 2016), available at http://turnthetiderx.org/ (last accessed December 18, 2017).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## II.    THE PARTIES

### A.    The Plaintiffs

12.    El Monte, California, by and through its attorneys hereto and its City Attorney, hereby brings this action on its own behalf for injuries suffered and on behalf of the People of the State of California to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance.

13.    El Monte has standing to recover damage incurred because of Defendants' actions and omissions. El Monte has standing to bring actions including, *inter alia*, public nuisance claims asserted under state law.

### B.    The Manufacturer Defendants

14.    The Manufacturer Defendants are defined below. At all relevant times, the Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted, and purported to warn or purported to inform prescribers and users regarding the benefits and risks associated with the use of prescription opioid drugs. Also at all relevant times, the Manufacturer Defendants have manufactured and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders.

15.    PURDUE PHARMA L.P. is a limited partnership organized under the laws of Delaware. PURDUE PHARMA INC. is a New York corporation with its principal place of business in Stamford, Connecticut. THE PURDUE FREDERICK COMPANY is a Delaware corporation with its principal place of business in Stamford, Connecticut (Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company are referred to collectively as "Purdue").

16.    Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin, MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER,[4] and Targiniq ER in the United States, including California. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its 2006

---

[4] Long-acting or extended release ("ER" or "ER/LA") opioids are designed to be taken once or twice daily. Short-acting opioids, also known as immediate release ("IR") opioids, last for approximately 4-6 hours.

1    sales of $800 million. OxyContin constitutes roughly 30% of the entire market for analgesic drugs

2    (painkillers).

3        17.    In May 2007, Purdue entered into a stipulated final judgment with the State of

4    California, acting by and through the California Attorney General, based principally on Purdue's

5    direct promotion of OxyContin through May 8, 2007, which is the effective date of the stipulated

6    final judgment (the "Purdue Final Judgment"). Through this Complaint, the People do not seek to

7    enforce any provision of the Purdue Final Judgment. The People also are not seeking any relief

8    against Purdue under any state consumer protection law (as that term is defined by section (I)(1)(M)

9    and footnote 1 of the Purdue Final Judgment) or based on any conduct by Purdue relating to its

10   promotional and marketing practices regarding OxyContin at any time up to and including May 8,

11   2007. The People, however, do assert claims arising under California law independent of the Purdue

12   Final Judgment, and seek civil penalties and injunctive relief as afforded by those laws.

13       18.    Richard S. Sackler is a natural person residing in Travis County, Texas. He is the

14   son of Purdue founder Raymond Sackler, and beginning in the 1990's, served as a member of the

15   board of directors of Purdue and Purdue-related entities. Richard S. Sackler is also a trustee of The

16   Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust"),

17   which is the 50% direct or indirect beneficial owner of Purdue and Purdue related entities and the

18   recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.

19       19.    Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut.

20   He is the son of Purdue founder Raymond Sackler, and has been a member of the board of directors

21   of Purdue and Purdue-related entities since the 1990's. Jonathan D. Sackler is also a trustee of the

22   Raymond Sackler Trust.

23       20.    Mortimer D.A. Sackler is a natural person residing in New York County, New York.

24   He is the son of Purdue founder Mortimer Sackler. Mortimer D.A. Sackler and has been a member

25   of the board of directors of Purdue and Purdue-related entities since the 1990's.

26       21.    Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. She

27   is the daughter of Purdue founder Mortimer Sackler, and has served as a member of the board of

28   directors of Purdue and Purdue-related entities since the 1990's.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1                                          - 4 -

22.     Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Purdue founder Mortimer Sackler and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990's.

23.     Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Purdue founder Raymond Sackler, and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990's. Beverly Sackler is also a trustee of the Raymond Sackler Trust.

24.     Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Purdue founder Mortimer Sackler, and has served as a member of the board of directors of Purdue and Purdue-related entities since the 1990's.

25.     David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and the grandson of Raymond Sackler), and has served as a member of the board of directors of Purdue and Purdue-related entities since 2012. Together, Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler and the Trust for the Benefit of the Members of the Raymond Sackler Family will hereinafter be collectively referred to as the "Sacklers" or the "Sackler Defendants." The Sackler Defendants are included in the defined term "Purdue," which is defined in paragraph 15 above. Thus, any causes of action asserted against Purdue as a Manufacturer Defendant in this Complaint are asserted against the Sackler Defendants as well.

26.     CEPHALON, INC. is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. TEVA PHARMACEUTICAL INDUSTRIES, LTD. ("Teva Ltd.") is an Israeli corporation with its principal place of business in Petah Tikva, Israel. In October 2011, Teva Ltd. acquired Cephalon, Inc. TEVA PHARMACEUTICALS USA, INC. ("Teva USA") is a wholly owned subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in Pennsylvania.

27.     Cephalon, Inc. manufactures, promotes, sells and distributes opioids such as Actiq and Fentora in the United States, including California. Significantly, the FDA only approved Actiq and Fentora for the management of breakthrough cancer pain in patients who are tolerant to around-

the-clock opioid therapy for their underlying persistent cancer pain. In 2008, Cephalon, Inc. pleaded guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading promotion of Actiq and two other drugs and agreed to pay $425 million.

28.     Teva Ltd., Teva USA, and Cephalon, Inc. work together closely to market and sell Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for Cephalon, Inc.in the United States through Teva USA and has done so since its October 2011 acquisition of Cephalon, Inc. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products to the public. Teva USA sells all former Cephalon-branded products through its "specialty medicines" division. The FDA approved prescribing information and medication guide, which is distributed with Cephalon opioids marketed and sold in California, discloses that the guide was submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events. Teva Ltd. has directed Cephalon, Inc. to disclose that it is a wholly-owned subsidiary of Teva Ltd. on prescription savings cards distributed in California, indicating Teva Ltd. would be responsible for covering certain co-pay costs.

29.     All of Cephalon, Inc.'s promotional websites, including those for Actiq and Fentora, prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon, Inc.'s and Teva's USA's sales as its own, and its year-end report for 2012—the year immediately following the Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion of a full year of Cephalon's specialty sales." Through interrelated operations like these, Teva Ltd. operates in California and the rest of the United States through its subsidiaries Cephalon, Inc. and Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Inc., Teva Ltd. would conduct those companies' business in the United States itself. Upon information and belief, Teva Ltd. directs the business practices of Cephalon, Inc. and Teva USA, and their profits inure to the benefit of Teva Ltd. as controlling shareholder. (together, Teva Ltd., Teva USA, and Cephalon, Inc. are referred to as "Cephalon"). Teva Branded Pharmaceutical Products R&D, Teva Neuroscience, Teva Parenteral Medicines, Teva Pharmaceuticals USA, and Teva Sales and Marketing are registered to do business in California with the California Secretary of State.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

30.   JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and it is a wholly owned subsidiary of JOHNSON & JOHNSON ("J&J"), a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. JANSSEN PHARMACEUTICA, INC., now known as Janssen Pharmaceuticals, Inc., is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Upon information and belief, J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceutical's products and Janssen's profits inure to J&J's benefit. (together, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to as "Janssen").

31.   Janssen manufactures, promotes, sells, and distributes drugs in the United States, including California, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

32.   ENDO HEALTH SOLUTIONS INC. is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. ENDO PHARMACEUTICALS INC. is a wholly owned subsidiary of Endo Health Solutions Inc. and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc. and Endo Pharmaceuticals Inc. are referred to collectively as "Endo").

33.   Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including California. In 2012, opioids made up roughly $403 million of Endo's overall revenues of $3 billion. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone,

oxymorphone, hydromorphone, and hydrocodone products in the United States, including California, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. Endo Medical (SA) International Trade Co., is registered to do business in California with the California Secretary of State.

34.     ACTAVIS, INC. and WATSON PHARMACEUTICALS, INC. merged in November 2012. The combined company changed its name first to Actavis, Inc. as of January 2013, and then later ACTAVIS PLC in October 2013. ACTAVIS PLC is a wholly owned subsidiary of Teva Ltd. WATSON LABORATORIES, INC. is a Nevada corporation with its principal place of business in Parsippany, New Jersey, and is a wholly owned subsidiary of Teva Ltd. ACTAVIS PHARMA, INC. (f/k/a Actavis, Inc.) is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS PHARMA, INC. is a wholly owned subsidiary of Teva Ltd. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. ACTAVIS LLC is a wholly owned subsidiary of Teva Ltd. Each of these defendants is owned by Teva Ltd., which uses them to market and sell its drugs in the United States (together, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to as "Actavis").

35.     Actavis manufactures, promotes, sells, and distributes opioids, including the branded drug Kadian, a generic version of Kadian, and generic versions of Duragesic and Opana, in the United States, including California. Actavis acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began marketing Kadian in 2009. Watson Laboratories, Inc. and Actavis Pharma, Inc. are registered to do business in California with the California Secretary of State.

36.     ALLERGAN PLC is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. ALLERGAN, INC. is a Delaware corporation with its principal place of business in Irvine, California and is a wholly owned subsidiary of Allergan plc. ALLERGAN USA, INC. is a Delaware corporation with its principal place of business in Madison, New Jersey and is a wholly owned subsidiary of Allergan plc (together Allergan plc,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1

- 8 -

1    Allergan, Inc., and Allergan USA, Inc. are referred to as "Allergan"). Allergan manufactures,

2    promotes, sells, and distributes opioids, including the branded drug Norco in the United States,

3    including California. Allergan USA, Inc. and Allergan, Inc. are registered to do business in

4    California with the California Secretary of State.

5            37.     Defendant INSYS THERAPEUTICS, INC., is a Delaware corporation with its

6    principal place of business located in Chandler, Arizona.

7            38.     Insys manufacturers, promotes, sells, and distributes opioids. Insys' principal source

8    of revenue is Subsys, a Schedule II transmucosal immediate-release formulation of fentanyl in the

9    United States, including California. Subsys was indicated by the FDA for the treatment of

10   breakthrough cancer pain that other opioids could not eliminate.

11           39.     In May 2018, an Insys sales representative admitted to taking part in a scheme to

12   bribe physicians with purported speaking fees for marketing and education events in exchange for

13   them prescribing Subsys for off-label uses. Insys' founder and several other former Insys executives

14   were recently indicted by federal prosecutors on racketeering charges, alleging that these

15   individuals approved and fostered fraudulent behavior against insurance companies and also

16   conspired to bribe practitioners in various states. Insys Group is registered to do business in

17   California with the California Secretary of State.

18           40.     MALLINCKRODT, PLC is an Irish public limited company headquartered in

19   Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri.

20   MALLINCKRODT, LLC, is a limited liability company organized and existing under the laws of

21   the State of Delaware. Mallinckrodt, LLC is a wholly owned subsidiary of Mallinckrodt, plc

22   (together, Mallinckrodt, plc and Mallinckrodt, LLC are referred to as "Mallinckrodt").

23           41.     Mallinckrodt manufactures, markets, and sells drugs in the United States including

24   generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt

25   agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to

26   detect and notify the DEA of suspicious orders of controlled substances. Mallinckrodt U.S.

27   Holdings, Mallinckrodt ARD Inc., Mallinckrodt Enterprise Holdings, and Mallinckrodt Hospital

28   Products are registered to do business in California with the California Secretary of State.

61526108.1                                    - 9 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

42.     Collectively, Purdue, Cephalon, Janssen, Endo, Teva, Actavis, Allergan, Insys, and Mallinckrodt are the "Manufacturer Defendants."

**C.     The Distributor Defendants**

43.     CARDINAL HEALTH, INC. ("Cardinal") is a publicly traded company incorporated under the laws of Ohio and with a principal place of business in Ohio.

44.     Cardinal distributes prescription opioids to providers and retailers, including in California. Cardinal has engaged in consensual commercial dealings with El Monte and its residents, and has purposefully availed itself of the advantages of conducting business with and within El Monte. Cardinal is in the chain of distribution of prescription opioids. Cardinal Health 100, Cardinal Health 127, and Cardinal Health 201 are registered to do business in California with the California Secretary of State.

45.     AMERISOURCEBERGEN CORPORATION ("AmerisourceBergen") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in Pennsylvania.

46.     AmerisourceBergen distributes prescription opioids to providers and retailers, including in California. AmerisourceBergen has engaged in consensual commercial dealings with El Monte and its residents, and has purposefully availed itself of the advantages of conducting business with and within El Monte. AmerisourceBergen is in the chain of distribution of prescription opioids. AmerisourceBergen Associate Assistance Fund, AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and AmerisourceBergen Services Corporation are registered to do business in California with the California Secretary of State.

47.     MCKESSON CORPORATION ("McKesson") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in San Francisco, California.

48.     McKesson distributes prescription opioids to providers and retailers, including in California. McKesson has engaged in consensual commercial dealings with El Monte and its residents, and has purposefully availed itself of the advantages of conducting business with and within El Monte. McKesson is in the chain of distribution of prescription opioids. McKesson

1    Corporation is registered to do business in California with the California Secretary of State.

2        49.    The data which reveals and/or confirms the identity of the other wrongful opioid

3    distributor is hidden from public view in the DEA's confidential ARCOS database. *See Madel v.*

4    *U.S. D.O.J.*, 784 F.3d 448, 451 (8th Cir. 2015). Neither the DEA nor the wholesale distributors will

5    voluntarily disclose the data necessary to identify with specificity the transactions which will form

6    the evidentiary basis for the claims asserted herein. *See id.* at 452-53.

7        50.    Collectively, AmerisourceBergen, Cardinal, and McKesson dominate 85% of the

8    market share for the distribution of prescription opioids. The "Big 3" are Fortune 500 corporations

9    listed on the New York Stock Exchange and their principal business consists of the nationwide

10   wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12

11   F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal, McKesson, and AmerisourceBergen

12   predecessors). Each has been investigated and/or fined by the DEA for the failure to report

13   suspicious orders. El Monte has reason to believe each has engaged in unlawful conduct which

14   resulted in the distribution, dispensing, and diversion of prescription opioids into El Monte. El

15   Monte names each of the "Big 3" herein as defendants and places the industry on notice that El

16   Monte is acting to abate the public nuisance plaguing its community. Distributor Defendants have

17   had substantial contacts and business relationships with the People. Distributor Defendants have

18   purposefully availed themselves of business opportunities within El Monte.

19       51.    Collectively, AmerisourceBergen, Cardinal, and McKesson are the "Distributor

20   Defendants."

21   **D.    The Doe Defendants**

22       52.    Plaintiff is ignorant of the true names or capacities, whether individual, corporate or

23   otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive,

24   and they are therefore sued herein pursuant to Code of Civil Procedure § 474. Plaintiff will amend

25   this Complaint to show their true names and capacities if and when they are ascertained. Plaintiff

26   is informed and believes, and on such information and belief alleges, that each of the Defendants

27   named as a DOE is responsible in some manner for the events and occurrences alleged in this

28   Complaint and is liable for the relief sought herein.

61526108.1                                     - 11 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

## III.   JURISDICTION AND VENUE

53.   This Court has jurisdiction over this action. Defendants are engaging in false and misleading advertising, negligent acts, and creating or assisting in the creation of a public nuisance in El Monte, and the People through their attorneys have the right and authority to prosecute this case on behalf of the People.

54.   Venue is proper in this Court because Defendants transact business in California and Los Angeles County, and some of the acts complained of occurred in this venue and the dispute arose in this venue.

## IV.   GENERAL FACTUAL ALLEGATIONS

### A.   An Overview of the Opioid Epidemic

55.   The term "opioid" includes all drugs derived from the opium poppy. The United States Food and Drug Administration describes opioids as follows: "Prescription opioids are powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and morphine, among others, and have both benefits as well as potentially serious risks. These medications can help manage pain when prescribed for the right condition and when used properly. But when misused or abused, opioids can cause serious harm, including addiction, overdose, and death."[5]

56.   Prescription opioids with the highest potential for addiction are listed under Schedule II of the Controlled Substances Act. This includes non-synthetic opium derivatives (such as codeine and morphine, also known generally as "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), and fully synthetic derivatives (such as fentanyl and methadone).

57.   Historically, opioids were considered too addictive and debilitating for the treatment of chronic pain such as back pain, migraines, and arthritis. According to Dr. Caleb Alexander, director of Johns Hopkins University's Center for Drug Safety and Effectiveness, "[opioids] have very, very high inherent risks . . . and there's no such thing as a fully safe opioid."[6]

---

[5] *See* U.S. FDA, Opioid Medications, available at https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm337066.htm (last accessed December 19, 2017).

[6] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity, available at https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-

61526108.1                                                    - 12 -

58.     Opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse.

59.     Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, as well as evidence of *greater* pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

60.     The market for chronic pain patients, however, was much larger, and to take advantage of it, the Defendants had to change doctors' general reluctance to prescribe opioids for chronic pain.[7]

61.     As described herein, Defendants engaged in conduct that directly caused doctors to prescribe skyrocketing amounts of opioids. Defendants also intentionally neglected their obligations to prevent diversion of the highly addictive substance.

62.     As a result of Defendants' wrongful conduct, the number of opioid prescriptions increased sharply, reaching nearly 250,000,000 prescriptions in 2013, which was almost enough for every person in the United States to have a bottle of pills. This represents an increase of 300% since 1999. In California, opioid prescribing rates peaked in 2013 when 54.9 opioid prescriptions were dispensed per 100 persons.

63.     Many Americans, including Californians and residents of El Monte, are now addicted to prescription opioids. In 2016, drug overdoses killed over 60,000 people in the United States, an increase of more than 22 percent over the previous year. The New York Times reported in September 2017, that the opioid epidemic is now killing babies and toddlers because deadly

---

unproven-opioid-solution (last accessed December 20, 2017).
[7] *See* Harriet Ryan et al., '*You want a description of hell?*' *OxyContin's 12-hour problem*, L.A. Times (May 5, 2016), available at http://www.latimes.com/projects/oxycontin-part1/ (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

opioids are "everywhere" and are easily mistaken as candy.[8] The opioid epidemic has been declared a public health emergency by the President of the United States. The wave of opioid addiction was created by the increase in prescriptions.

64.     One in 4 Americans receiving long-term opioid therapy struggles with opioid addiction. Nearly 2 million Americans have a prescription opioid use disorder. According to the NIH's National Institute on Drug Abuse, approximately 21 to 29 percent of patients prescribed opioids for chronic pain misuse them. Between 8 and 10 percent develop an opioid use disorder. Four to 6 percent of people who misuse prescription opioids transition to heroin abuse, and about 80 percent of people who use heroin first misused prescription opioids.

65.     Drug overdose deaths among all Americans increased more than 200 percent between 1999 and 2015.

66.     Deaths from prescription opioids have quadrupled in the past 20 years. In California, there were 4,654 total opioid overdose deaths in 2016.[9]

///

///

///

---

[8] Julie Turkewitz, *"The Pills are Everywhere:" How the Opioid Crisis Claims Its Youngest Victims*, N.Y. Times (Sept. 20, 2017), available at https://www.nytimes.com/2017/09/20/us/opioid-deaths-children.html (last accessed January 4, 2018).
[9] *See* Center for Disease Control (CDC)/NCHS, National Vital Statistics System, Mortality, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed August 13, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

67.    At the same time, treatment admissions for abuse of opioids and emergency room visits for non-medical opioid use have dramatically increased. The increases in opioid deaths and treatments are directly tied to the prescribing practices created by Defendants. According to the CDC[10], opioid deaths and treatment admissions are tied to opioid sales:



Rates of Opioid Sales, OD Deaths, and Treatment, 1999–2010

CDC. *MMWR* 2011

68.    People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin, which is pharmacologically similar to prescription opioids. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use. According to the CDC, heroin drug overdose deaths have more than tripled in the past four years. In California, 355 overdose deaths in 2016 involved heroin.[11]

---

[10] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf (last accessed December 29, 2017).

[11] *See* National Institute of Drug Abuse, California Opioid Summary, available at

61526108.1

- 15 -

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

69.     Prescription opioid abuse "is a serious national crisis that affects public health as well as social and economic welfare." The economic burden of prescription opioid misuse alone on the public is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction treatment, and criminal justice expenditures.[12]

**B.      The Manufacturer Defendants Spread False or Misleading Information About the Safety of Opioids**

70.     Each Manufacturer Defendant developed a well-funded marketing scheme based on deception to persuade doctors and patients that opioids can and should be used to treat chronic pain without risk of abuse or addiction, resulting in opioid prescriptions to a far larger group of patients who are much more likely to become addicted. In connection with this scheme, each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional activities and materials that falsely deny or minimize the risks of opioids.

71.     The Manufacturer Defendants employed the same marketing plans and strategies, and deployed the same messages in and around California, including in El Monte, as they did nationwide. Across the pharmaceutical industry, corporate headquarters are responsible for funding and overseeing "core message" development on a national basis. This comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and consistently delivered across marketing channels—including detailing visits, speaker events, and advertising—and in each sales territory. The Manufacturer Defendants consider this high level of coordination and uniformity crucial to successfully marketing their prescription drugs.

72.     To increase the impact of their deceptive marketing schemes, on information and belief the Manufacturer Defendants coordinated and created unified marketing plans to ensure that the Manufacturer Defendants' messages were consistent with one another and effective across all their marketing efforts.

73.     The deceptive marketing schemes included, among others: (a) false or misleading

---

https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/california-opioid-summary, (last accessed August 13, 2018).
[12] Opioid Crisis, NIH, National Institute on Drug Abuse, available at https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis (last accessed December 19, 2017).

61526108.1                                              - 16 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

direct, branded advertisements; (b) false or misleading direct-to-physician marketing, also known as "detailing;" (c) false or misleading materials, speaker programs, webinars, and brochures; and (d) false or misleading unbranded advertisements or statements by purportedly neutral third parties that were really designed and distributed by the Manufacturer Defendants. All of these schemes were geared towards convincing both doctors and patients that opioid use to treat chronic pain carried a low, or no, risk of addiction.

74.     Contrary to the language on their drugs' labels regarding the serious risks associated with their use, the Manufacturer Defendants made false and misleading claims that: (a) downplayed the serious risk of addiction; (b) created and promoted the concept of "pseudoaddiction" when signs of actual addiction began appearing, and advocated that the signs of addiction should be treated with more opioids; (c) exaggerated the effectiveness of screening tools to prevent addiction; (d) claimed that opioid dependence and withdrawal are easily managed; (e) denied the risks of higher dosages; and (f) exaggerated the effectiveness of "abuse-deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no scientifically reliable evidence to support the Manufacturer Defendants' claims.

75.     These statements were not only unsupported by or contrary to the scientific evidence, but they also were contrary to pronouncements by and guidance from the FDA and CDC based on that exact same evidence. Indeed, as discussed herein, the 2016 CDC Guideline makes it patently clear that the Manufacturer Defendants' schemes were and continue to be deceptive.

76.     The Manufacturer Defendants began their marketing schemes decades ago and continue them today.

77.     The Manufacturer Defendants' efforts have been wildly successful. Opioids are now the most prescribed class of drugs. Globally, opioid sales generated $1.1 billion in revenue for drug companies in 2010 alone, and sales in the United States have exceeded $8 billion in revenue

annually since 2009.[13] In an open letter to the nation's physicians in August 2016, the U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of opioids to doctors. . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain."[14]

78.    On information and belief, as a part of their deceptive marketing schemes, the Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient populations in the United States, including California.

79.    For example, on information and belief, the Manufacturer Defendants focused their deceptive marketing schemes on primary care doctors, who were more likely to treat chronic pain patients and prescribe them drugs, but who were less likely to be well-schooled in treating pain and the risks and benefits of opioids, including abuse and addiction, and therefore more likely to accept the Manufacturer Defendants' misrepresentations.

80.    On information and belief, the Manufacturer Defendants also targeted vulnerable patient populations like the elderly and veterans, who tend to suffer from chronic pain.

81.    The Manufacturer Defendants targeted these vulnerable patients even though the risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC Guideline observed that existing evidence showed that elderly patients taking opioids suffer from elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to adverse drug effects and interactions. The Guideline therefore concluded that there are special risks of long-term opioid use for elderly patients and recommended that doctors use "additional caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for post-traumatic stress disorder, which interact dangerously with opioids.

82.    The Manufacturer Defendants intentionally continued their conduct, as alleged herein, with knowledge that such conduct was creating the opioid nuisance and causing the harms

---

[13] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, (Nov. 9, 2011); David Crow, *Drugmakers Hooked on 10bn Opioid Habit*, Fin. Times (August 10, 2016).
[14] Murthy, supra note 3.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

and damages alleged herein.

    1.    **The Manufacturer Defendants Engaged in False and Misleading Direct Marketing of Opioids**

83.    Each Manufacturer Defendant conducted, and continues to conduct, direct marketing consisting of advertising campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

84.    A number of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example:

    a.    Endo, on information and belief, has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

    b.    On information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

85.    Although Endo and Purdue agreed in late 2015 and 2016 to cease making these misleading representations in New York, they continued to disseminate them elsewhere throughout the United States, including California.

86.    The direct advertising disseminated by the Manufacturer Defendants failed to disclose studies that were not favorable to their products, or that they lacked clinical evidence to support many of their claims.

    2.    **The Manufacturer Defendants Used Detailing and Speaker Programs to Spread False and Misleading Information About Opioids**

87.    Each Manufacturer promoted the use of opioids for chronic pain through "detailers"—sophisticated and specially trained sales representatives who visited individual doctors and medical staff in their offices—and small group speaker programs.

88.    The Manufacturer Defendants invested heavily in promoting the use of opioids for

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

chronic pain through detailers and small group speaker programs.

89.    The Manufacturer Defendants devoted massive resources to direct sales contacts with doctors via detailers. Upon information and belief, the Manufacturer Defendants spend in excess of $168 million in 2014 alone on detailing branded opioids to doctors, more than twice what they spent on detailing in 2000. From mid-2013 through 2015, Purdue, Janssen, and Endo detailed at least 6,238, 584, and 195 prescribers in California respectively. By itself, Purdue was responsible for more than 1 out of every 3 reported opioid-related detailing visits in California by Defendants.

90.    On information and belief, these detailers have spread and continue to spread misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors, including thousands of doctors in California, in the following manner:

   a.  Describe the risk of addiction as low or fail to disclose the risk of addiction;

   b.  Describe their opioid products as "steady state" – falsely implying that these products are less likely to produce the high and lows that fuel addiction – or as less likely to be abused or result in addiction;

   c.  Tout the effectiveness of screening or monitoring patients as a strategy for managing opioid abuse and addiction;

   d.  State that there is no maximum dose and that doctors can safely increase doses without disclosing the significant risks to patients at higher doses;

   e.  Discuss "pseudoaddiction;"

   f.  State that patients would not experience withdrawal if they stopped using their opioid products; and

   g.  State that abuse-deterrent formulations are tamper- or crush-resistant and harder to abuse or misuse.

91.    Because these detailers must adhere to scripts and talking points drafted by the Manufacturer Defendants, it can be reasonably inferred that most, if not all, of the Manufacturer Defendants' detailers made and continue to make these misrepresentations to the thousands of California doctors they have visited and continue to visit. The Manufacturer Defendants have not corrected this misinformation.

92.    The Manufacturer Defendants' detailing to doctors was highly effective in generating the national proliferation of prescription opioids. On information and belief, the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   Manufacturer Defendants used sophisticated data mining and intelligence to track and understand
2   the rates of initial prescribing and renewal by individual doctors, allowing specific and individual
3   targeting, customizing, and monitoring of their marketing efforts.

4        93.    The Manufacturer Defendants also identified doctors to serve on their speakers'
5   bureaus in exchange for payment and other remuneration, as well as attend programs with speakers
6   and meals paid for by the Manufacturer Defendants. These speakers gave the false impression that
7   they were providing unbiased and medically accurate presentations when they were in fact
8   presenting a script prepared by the Manufacturer Defendants. On information and belief, these
9   presentations conveyed misleading information, omitted material information, and failed to correct
10  the Manufacturer Defendants' prior misrepresentations about the risks and benefits of opioids,
11  including addiction risks.

12       94.    Each Manufacturer Defendant devoted and continues to devote massive resources
13  to direct sales contacts with doctors. In 2014 alone, Defendants spent $168 million on detailing
14  branded opioids to doctors. This amount is twice as much as Defendants spent on detailing in 2000.
15  The amount includes $108 million spent by Purdue, $34 million by Janssen, $10 million by Endo,
16  and $2 million by Actavis.

17       95.    Marketing impacts prescribing habits, with face-to-face detailing having the greatest
18  influence. On information and belief, more frequent prescribers are generally more likely to have
19  received a detailing visit, and in some instances, more infrequent prescribers of opioids received a
20  detailing visit from a Manufacturer Defendant's detailer and then prescribed only that Manufacturer
21  Defendant's opioid products.

22       96.    The FDA has cited at least one Manufacturer Defendant for deceptive promotions
23  used by its detailers and in its direct-to-physician marketing. In 2010, the FDA notified Actavis that
24  certain brochures distributed by Actavis were "false or misleading because they omit and minimize
25  the serious risks associated with [Kadian], broaden and fail to present the limitations to the
26  approved indication of the drug, and present unsubstantiated superiority and effectiveness claims."
27  The FDA also found that "[t]hese violations are a concern from a public health perspective because
28

61526108 1

- 21 -

1    they suggest that the product is safer and more effective than has been demonstrated."[15]

2              **3.**      **The Manufacturer Defendants Deceptively Marketed Opioids through**

3                      **Seemingly Independent Third Parties that Disseminated Unbranded**

4                      **Advertising Created by the Manufacturer Defendants**

5        97.    The Manufacturer Defendants also deceptively marketed opioids in California

6    through unbranded advertising—i.e., advertising that promotes opioid use generally but does not

7    name a specific opioid. This type of advertising was ostensibly created and disseminated by

8    independent third parties. But by funding, directing, reviewing, editing, and distributing unbranded

9    advertising, the Manufacturer Defendants coordinated and controlled the deceptive messages

10   disseminated by these third parties and acted in concert with them to falsely and misleadingly

11   promote opioids for the treatment of chronic pain as non-addictive.

12       98.    The extent of the financial ties between the opioid industry and third-party advocacy

13   groups is stunning. A recent report released by the United State Senate Homeland Security and

14   Governmental Affairs Committee reveals nearly $9 million in payments from companies, including

15   Purdue and Janssen, to 14 outside groups between 2012 and 2017.[16] According to the report, "[t]he

16   fact that ... manufacturers provided millions of dollars to the groups described below suggests, at

17   the very least, a direct link between corporate donations and the advancement of opioids-friendly

18   messaging." The report concluded that "many of the groups described in this report may have

19   played a significant role in creating the necessary conditions for the U.S. opioids epidemic."

20       99.    The Manufacturer Defendants utilized third-party, unbranded advertising to market

21   opioids to avoid regulatory scrutiny because such advertising is not submitted to and typically is

22   not reviewed by the FDA. The Manufacturer Defendants also used third-party, unbranded

23   advertising to give the false appearance that the deceptive messages came from an independent and

24

---

25   [15] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Comme'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at

26   http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (last accessed December 29, 2017).

27   [16] *See* Scott Neuman & Alison Kodjak, *Drugmakers Spend Millions Promoting Opioids To Patient Groups, Senate Report Says*, NPR.org (Feb. 13, 2018), available at https://www.npr.org/sections/thetwo-way/2018/02/13/585290752/drugmakers-spent-millions-promoting-opioids-to-patient-groups-senate-

28   report-says (last accessed February 23, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

therefor objective source. Like tobacco companies did before them, the Manufacturer Defendants used third parties that they funded, directed, and controlled to carry out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-term opioid use for chronic pain.

100.    The Manufacturer Defendants' deceptive, third-party, unbranded advertising often contradicted what they said in their branded materials reviewed by the FDA. For example, Endo's unbranded advertising stated that "People who take opioids as prescribed usually do not become addicted." This directly contradicted its concurrent, branded advertising for Orpana ER, which warned that "use of opioid analgesic products carries the risk of addiction even under appropriate medical use."

101.    In addition to using third parties to disguise the source of their misinformation campaign, the Manufacturer Defendants also retained the services of a small group of physicians—known as "key opinion leaders" or "KOLs"—to convince both doctors and patients that opioid use to treat chronic pain carried a low, or no, risk of addiction. On information and belief, the Manufacturer Defendants' KOLS were selected, funded, and elevated by the Manufacturer Defendants because their public positions supported the use of opioids to treat chronic pain.

102.    Manufacturer Defendants paid these KOLs to serve as consultants or on their advisory boards and to give talks or present continuing medical education programs (CMEs), and their support helped these KOLs become respected industry experts. As they rose to prominence, these KOLs touted the benefits of opioids to treat chronic pain without significant risk of addiction, repaying Defendants by advancing their marketing goals. These KOLs' professional reputations became dependent on continuing to promote a pro-opioid message.

103.    Pro-opioid doctors like the KOLs are one of the most important avenues that the Manufacturer Defendants use to spread their false and misleading statements about the risks and benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily and more uncritically on their peers for guidance, and KOLs provide the false appearance of unbiased and reliable support for treatment of chronic pain through chronic opioid therapy without significant risk of addiction.

104.    For example, the New York Attorney General ("NY AG") found in its settlement

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   with Purdue that through March 2015, the Purdue website *In the Face of Pain* failed to disclose

2   that doctors who provided testimonials on the site were paid by Purdue,[17] and concluded that

3   Purdue's failure to disclose these financial connections potentially misled consumers regarding the

4   objectivity of the testimonials.

5       105.   The Manufacturer Defendants' KOLs have written, consulted on, edited, and lent

6   their names to books and articles, and given speeches and CMEs supportive of chronic opioid

7   therapy while minimizing risks of addiction. Manufacturer Defendants also created opportunities

8   for their KOLs to participate in research studies Manufacturer Defendants suggested or chose and

9   then cited and promoted favorable studies or articles by their KOLs. By contrast, Defendants did

10   not support, acknowledge, or disseminate publications of doctors unsupportive or critical of chronic

11   opioid therapy that acknowledged risks of addiction.

12       106.   The Manufacturer Defendants' KOLs also served on committees that developed

13   treatment guidelines that strongly encourage the use of opioids to treat chronic pain and on the

14   boards of pro-opioid advocacy groups and professional societies that develop, select, and present

15   CMEs. These guidelines and CMEs were not supported by the scientific evidence at the time they

16   were created, and they are not supported by the scientific evidence today. Defendants were able to

17   direct and exert control over each of these activities through their KOLs. Notably, the 2016 CDC

18   Guideline recognizes that treatment guidelines can "change prescribing practices."

19       107.   Pro-opioid KOLs have admitted to making false claims about the effectiveness of

20   opioids. For example, Dr. Russell Portenoy received research support, consulting fees, and other

21   compensation from Cephalon, Endo, Janssen, and Purdue, among others. Dr. Portenoy

22   subsequently admitted that he "gave innumerable lectures ... about addictions that weren't true."

23   His lectures as a pro-opioid KOL falsely claimed that fewer than 1 percent of patients would

24   become addicted to opioids, but Dr. Portenoy later admitted that the primary goal was to

---

26   [17] *See* New York State Office of the Attorney General, *A.G. Schneiderman Announces Settlement with*

27   *Purdue Pharma That Ensures Responsible and Transparent Marketing Of Prescription Opioid Drugs By*
*The Manufacturer* (August 20, 2015), available at https://ag.ny.gov/press-release/ag-schneiderman-

28   announces-settlement-purdue-pharma-ensures-responsible-and-transparent (last accessed December 20,
2017).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

"destigmatize" opioid. Dr. Portenoy conceded that "[d]ata about the effectiveness of opioids does not exist." According to Dr. Portenoy, "Did I teach about pain management, specifically about opioid therapy, in a way that reflects misinformation? Well, . . . I guess I did." Dr. Portenoy admitted that "[i]t was clearly the wrong thing to do."[18]

108. Dr. Portenoy also made frequent media appearances promoting opioids and spreading misrepresentation, such as his claim "the likelihood that the treatment of pain using an opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He even appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat chronic pain. On this widely-watched program broadcast across the country, Dr. Portenoy claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that the person is not going to become addicted."[19]

109. Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr. Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. (He also is a Senior Editor of Pain Medicine, which is the same journal that published the Endo special advertising supplements touting Opana ER.) Dr. Webster was the author of numerous CMEs sponsored by Cephalon, Endo and Purdue, which advocated the use of chronic opioid therapy. At the same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants, including nearly $2 million from Cephalon.

110. Ironically, Dr. Webster created and promoted the Opioid Risk Tool, which is a five-question, one-minute screening tool relying on patient self-reports that purportedly allows doctors to manage the risk that their patients will become addicted to or abuse opioids. The claimed ability to pre-sort patients likely to become addicted is an important tool in giving doctors confidence to

---

[18] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J. (Dec. 17, 2012), available at https://www.wsj.com/articles/SB10001424127887324478304578173342657044604 (last accessed December 20, 2017).
[19] Good Morning America (ABC television broadcast Aug. 30, 2010).

prescribe opioids long-term, and, for this reason, references to screening appear in various industry supported guidelines. Versions of Dr. Webster's Opioid Risk Tool appear on, or are linked to, websites run by Endo, Janssen and Purdue. Unaware of the flawed science and industry bias underlying this tool, certain states and public entities have incorporated the Opioid Risk Tool into their own guidelines, indicating their reliance on the Manufacturer Defendants and those under their influence and control.

111.   In 2011, Dr. Webster presented a webinar program sponsored by Purdue entitled "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of prescriptions" and "overdose deaths." This webinar was available to and was intended to reach doctors in El Monte and doctors treating residents of El Monte.[20]

112.   Dr. Webster also was a leading proponent of the concept of "pseudoaddiction," which is the notion that addictive behaviors should be seen as indications of undertreated pain and not a warning. In Dr. Webster's description, the only way to differentiate the two was to increase a patient' dose of opioids. As he and co-author Beth Dove wrote in their 2007 book *Avoiding Opioid Abuse While Managing Pain*—a book that remains available online—when faced with signs of aberrant behavior, increasing the dose "in most cases ... should be the clinician's first response."[21] Upon information and belief, Endo distributed this book to doctors. Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously became too much of an excuse to give patients more medication."[22]

113.   On information and belief, the Manufacturer Defendants also entered into arrangements with seemingly unbiased and independent patient and professional organizations to promote opioids for the treatment of chronic pain. Under the direction and control of the Manufacturer Defendants, these "Front Groups"—which include, but are not limited to, the

[20] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, available at http://www.emergingsolutionsinpain.com/ce-education/opioidmanagement?option=com_co ntinued&view=frontmatter&Itemid=303&course=209 (last visited Aug. 22, 2017).
[21] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
[22] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, (Feb. 18, 2012).

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

American Pain Foundation ("APF")[23] and the American Academy of Pain Medicine—generated treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy. The evidence did not support these guidelines, materials, and programs at the time they were created, and the scientific evidence does not support them today. Indeed, they stand in marked contrast to the 2016 CDC Guideline.

114.     The Manufacturer Defendants worked together through Front Groups to spread their deceptive messages about the risks and benefits of long-term opioid therapy. Indeed, the Manufacturer Defendants spent millions on the Front Groups to generate false opioid-friendly messaging.[24] The amount of industry funding, and its sources, is obscured by a lack of transparency on behalf of both the opioid industry and the Front Groups.

115.     On information and belief, these Front Groups also assisted the Manufacturer Defendants by responding to negative articles, advocating against regulatory or legislative changes that would limit opioid prescribing in accordance with the scientific evidence, and conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

116.     These Front Groups depended on the Manufacturer Defendants for funding and, in some cases, for their very survival. On information and belief, the Manufacturer Defendants exercised control over programs and materials created by these groups by collaborating on, editing, and approving their content, and by funding their dissemination. In doing so, the Manufacturer Defendants made sure that the Front Groups would only generate messages the Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves out as independent experts serving the needs of their members, whether patients suffering from pain or doctors treating those patients.

117.     In particular, Cephalon, Endo, Janssen, and Purdue utilized many Front Groups, including many of the same ones. Several of the most prominent Front Groups are described in greater detail below, but there are many others, including the American Pain Society, American Geriatrics Society, the Federation of State Medical Boards, American Chronic Pain Association,

---

[23] Dr. Portenoy was a member of the board of the APF.
[24] See Neuman & Kodjack, *supra* note 16.

61526108.1                                                   - 27 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

the Center for Practical Bioethics, the U.S. Pain Foundation, and the Pain & Policy Studies Group.[25]

118.   Organizations, including the U.S. Senate Finance Committee, began to investigate the American Pain Foundation ("APF") in 2012 to determine the links, financial and otherwise, between APF and the opioid industry.[26] The investigation revealed that APF received 90 percent of its funding from the drug and medical-device industry, and "its guides for patients, journalists and policymakers had played down the risks associated with opioid painkillers while exaggerating the benefits from the drugs." Within days, APF dissolved "due to irreparable economic circumstances."

119.   Another one of the Front Groups for the Manufacturer Defendants was the American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement, and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines and sponsored and hosted medical education programs essential to the Manufacturer Defendants' deceptive marketing of chronic opioid therapy.

120.   AAPM received substantial funding from opioid manufacturers. For example, AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top of other funding) to participate. The benefits included allowing members to present educational programs at off-site dinner symposia in connection with AAPM's marquee event—its annual meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual event as an "exclusive venue" for offering education programs to doctors. Membership in the corporate relations council also allows drug company executives and marketing staff to meet with AAPM executive committee members in small settings. Defendants Endo, Purdue, and Cephalon were members of the council and presented deceptive programs to doctors who attended these annual events.

121.   On information and belief, AAPM is viewed internally by Endo as "industry

---

[25] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015).

[26] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies Ties to Pain Groups*, Wash. Post (May 8, 2012), available at https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-paid-groups/2012/05/08/gIQA2X4qBU_story.html (last accessed December 19, 2017).

61526108.1                         - 28 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    friendly," with Endo advisors and speakers among its active members. Endo attended AAPM

2    conferences, funded its CMEs, and distributed its publications. The conferences sponsored by

3    AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.

4    AAPM's presidents have included top industry-supported KOLs like Lynn Webster and Perry Fine

5    of the University of Utah. Dr. Webster was even elected as AAPM's president while under DEA

6    investigation.

7        122.   The Manufacturer Defendants were able to influence AAPM through both their

8    significant and regular funding and the leadership of pro-opioid KOLs within the organization.

9        123.   In 1996, AAPM and APS jointly issued a consensus statement entitled "The Use of

10   Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain while

11   claiming that the risk of a patient's addiction to opioids was low. Dr. Haddox, who co-authored the

12   AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was the sole

13   consultant. The consensus statement remained on AAPM's website until 2011, and upon

14   information and belief, was taken down from AAPM's website only after a doctor complained.[27]

15       124.   AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines")

16   and continued to recommend the use of opioids to treat chronic pain while minimizing the risk of

17   addiction.[28]   Treatment guidelines like these have been relied upon by doctors, especially the

18   general practitioners and family doctors targeted by the Manufacturer Defendants, to prescribe

19   opioids to treat chronic pain. Treatment guidelines not only directly inform doctors' prescribing

20   practices, but they also are cited throughout the scientific literature and referenced by third-party

21   payors in determining whether they should cover treatments for specific indications.

22   Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed treatment

23   guidelines with doctors during individual sales visits.

24       125.   At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines,

25   including KOLs Dr. Portenoy and Dr. Perry Fine, received support from Janssen, Cephalon, Endo,

26

27   [27] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6 (1997).

28   [28] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

and Purdue. The 2009 AAPM/APS Guidelines promote opioids as "safe and effective" for treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of addiction is manageable for patients regardless of past abuse histories.[29] One panel member, Dr. Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the Michigan Headache & Neurological Institute, resigned from the panel because of his concerns that the 2009 AAPM/APS Guidelines were influenced by contributions from drug companies, including Manufacturer Defendants, to the sponsoring organizations and committee members. The 2009 AAPM/APS Guidelines have been a particularly effective channel of deception and have influenced not only treating physicians, but also the body of scientific evidence on opioids. The 2009 AAPM/APS Guidelines have been cited hundreds of times in academic literature, were disseminated in El Monte during the relevant time period, are still available online, and were often reprinted in the Journal of Pain, which is the official journal of the American Pain Society. The Manufacturer Defendants widely referenced and promoted the 2009 AAPM/APS Guidelines without disclosing the lack of evidence to support their conclusions or the Manufacturer Defendants' financial support to members of the panel.

126.   On information and belief, the Manufacturer Defendants combined their efforts through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is comprised of representatives from opioid manufacturers (including Endo, Janssen, and Purdue) and various Front Groups, almost all of which received substantial funding from the Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated education project on opioids was not unacceptably negative and did not require mandatory participation by prescribers. PCF also worked to address a lack of coordination among its members and develop cohesive industry messaging.

127.   On information and belief, through Front Groups and KOLs, the Manufacturer Defendants wrote or influenced prescribing guidelines that reflected the messaging the Manufacturer Defendants wanted to promote rather than scientific evidence regarding dangers of

[29] *Id.*

61526108.1

- 30 -

COMPLAINT

1    addiction.

2        128.    Through these means, and likely others still concealed, the Manufacturer

3    Defendants collaborated to spread deceptive messages about the risks and benefits of long-term

4    opioid use.

5        **C.    The Manufacturer Defendants' Statements about the Safety of Opioids Were**

6            **Patently False**

7        129.    To convince doctors and patients that opioids carry a low risk of addiction,

8    Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term opioid

9    use, particularly the risk of addiction, through a series of misrepresentations that the FDA and CDC

10   conclusively debunked.

11       130.    These misrepresentations reinforced each other and created the dangerously

12   misleading impressions, among others, that: (a) starting patients on opioids was low-risk because

13   most patients would not become addicted, and because those who were at greatest risk of addiction

14   could be readily identified and managed; (b) patients who displayed signs of addiction probably

15   were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher

16   opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs,

17   do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are

18   inherently less addictive.

19       131.    Some examples of these false and misleading claims that were made by, are

20   continuing to be made by, and/or have not been corrected by Manufacturing Defendants, include:

21          a.   Actavis's predecessor caused a patient education brochure, Managing Chronic
                 Back Pain, to be distributed beginning in 2003 that admitted that opioid
22               addiction is possible, but falsely claimed that it is "less likely if you have never
                 had an addiction problem." Based on Actavis's acquisition of its predecessor's
23               marketing materials along with the rights to Kadian, it appears that Actavis
                 continued to use this brochure in 2009 and beyond.
24
            b.   Cephalon and Purdue sponsored APF's Treatment Options: A Guide for
25               People Living with Pain (2007), which suggests that addiction is rare and
                 limited to extreme cases of unauthorized dose escalations, obtaining
26               duplicative prescriptions, or theft. This publication remains available today.[30]

27
     _____
28   [30] Available at https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (last
     615261081                              - 31 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

c.  Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not become addicted." Upon information and belief, another Endo website, PainAction.com, stated "Did you know? Most chronic pain patients do not become addicted to the opioid medications that are prescribed for them." Endo also distributed an "Informed Consent" document on PainAction.com that misleadingly suggested that only people who "have problems with substance abuse and addiction" are likely to become addicted to opioid medications.

d.  Upon information and belief, Endo and Cephalon distributed a pamphlet with the Endo logo entitled *Living with Someone with Chronic Pain*, which stated that "[m]ost health care providers who treat people with pain agree that most people do not develop an addiction problem." A similar statement appeared on the Endo website www.opana.com.

e.  Janssen reviewed, edited, approved, and distributed a patient education guide entitled Finding Relief: Pain Management for Older Adults (2009), which described as "myth" the claim that opioids are addictive, and asserted as fact that "[m]any studies show that opioids are rarely addictive when used properly for the management of chronic pain." This guide is still available online.

f.  Janssen currently runs a website, *Prescriberesponsibly.com* (last updated July 2, 2015), which claims that concerns about opioid addiction are "overestimated."[31]

g.  Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management* – which claims that less than 1% of children prescribed opioids will become addicted and that pain is undertreated due to "misconceptions about opioid addiction[]." This publication is still available online.[32]

h.  Detailers for the Manufacturer Defendants in California have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in California, including in El Monte, about the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

132.  The Manufacturer Defendants engaged in this campaign of misinformation in an intentional effort to deceive doctors and patients and thereby increase the use of their opioid products.

133.  The Manufacturer Defendants' misrepresentations have been conclusively debunked by the FDA and CDC, and are contrary to longstanding scientific evidence.

---

accessed December 19, 2017).
[31] Available at, http://www.prescriberesponsibly.com/articles/opioid-pain-management (last accessed December 19, 2017).
[32] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

134.     As noted in the 2016 CDC Guideline[33] endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including ... opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

135.     The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release/long-acting opioids in 2013 and for immediate-release opioids in 2016. In its announcements, the FDA found that "most opioid drugs have '*high potential for abuse*'" and that opioids "are associated with a *substantial risk of misuse*, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." (Emphasis added.)[34] According to the FDA, because of the "*known* serious risks" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, *even at recommended doses*, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. (Emphasis added.) The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

136.     The Manufacturer Defendants have been and are aware that their misrepresentations about opioids are false.

137.     In a 2016 settlement agreement with Endo, the NY AG found that opioid "use disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical

---

[33] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly. Rep. (Mar. 18, 2016) [hereinafter 2016 CDC Guideline], available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (last accessed December 20, 2017).
[34] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food & Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.d., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), available at https://www.regulations/gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf (last accessed December 19, 2017); Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food & Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan & Becker, LLP (Mar. 22, 2016), available at https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf (last accessed December 19, 2017).

criteria for an opioid use disorder."[35] While Endo claimed until at least April 2012 on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," the NY AG found that Endo had no evidence for that statement. Consistent with this finding, Endo agreed not to "make statements that ... opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This prohibition did not extend to California.

138. The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. The Manufacturer Defendants called this phenomenon "pseudoaddiction"—a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Drs. Portenoy and Webster—and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants are described below:

    a. Cephalon, Endo, and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. *Responsible Opioid Prescribing* remains for sale online.[36]

    b. On information and belief, Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain *is under-treated* . . . . Pseudoaddiction is different from true addiction because such behaviors can be resolved with effective pain management."

    c. Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

    d. Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate

---

[35] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc.* (Assurance No. 15-228), at 13, available at https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf (last accessed December 19, 2017).

[36] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1

- 34 -

interpretation of [drug- seeking behaviors] in patients who have pain that has not been effectively treated."

e.   Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse" in 2011. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long acting opioid.

f.   Details for Purdue have directed doctors and their medical staffs in California, including in El Monte, to PartnersAgainstPain.com, which contained false and misleading materials describing pseudoaddiction.

g.   Purdue and Cephalon sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated…Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."

**Deceptive Claims of Pseudoaddiction**

139.    The concept of pseudoaddiction is fictional. The 2016 CDC Guideline rejects pseudoaddiction and does not recommend that opioid dosages be increased if a patient is not experiencing pain relief. Instead, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment ... are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

140.    In connection with its 2016 settlement with the NY AG, Endo was forced to admit that the concept of pseudoaddiction was a sham. Indeed, the NY AG found that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents" and reported that despite the fact that Endo trained its sales representative to use the concept of pseudoaddiction, "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

and 'pseudoaddiction.'"[37] Consistent with the NY AG's conclusions, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York. Endo made no such agreement with respect to California.

141.   The Manufacturer Defendants also falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants after March 21, 2011, are described below:

    a.  On information and belief, Endo paid for a 2007 supplement in the *Journal of Family Practice* written by a doctor who became a member of Endo's speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming that patients at high risk of addiction could safely receive chronic opioid therapy using a "maximally structured approach" involving toxicology screens and pill counts.

    b.  On information and belief, Purdue sponsored a November 2011 webinar, *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that screening tools, urine tests, and patient agreements prevent "overuse of prescriptions" and "overdose deaths."

    c.  On information and belief, as recently as 2015, Purdue has represented in scientific conferences that "bad apple" patients – and not opioids – are the source of the addiction crisis and that once those "bad apples" are identified, doctors can safely prescribe opioids without causing addiction.

    d.  On information and belief, detailers for the Manufacturer Defendants have touted and continue to tout to doctors in California, including El Monte the reliability and effectiveness of screening or monitoring patients as a tool for managing opioid abuse and addiction.

142.   Once again, the 2016 CDC Guideline confirms that these types of statements were false, misleading, and unsupported at the time they were made by the Manufacturer Defendants. The 2016 CDC Guideline notes that there are *no* studies assessing the effectiveness of risk

---

[37] *See supra* note 35, at 7.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts

2  widely believed by doctors to detect and deter abuse—"for improving outcomes related to

3  overdose, addiction, abuse, or misuse." As a result, the 2016 CDC Guideline recognizes that

4  available risk screening tools "show *insufficient accuracy* for classification of patients as at low or

5  high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the

6  ability of these tools to rule out risks from long-term opioid therapy." (Emphasis added.)

7      143.    To underplay the risk and impact of addiction and make doctors feel more

8  comfortable starting patients on opioids, the Manufacturer Defendants falsely claimed that opioid

9  dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and

10  failed to disclose the increased difficulty of stopping opioids after long-term use.

11      144.    For example, on information and belief, a 2011 non-credit educational program

12  sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms

13  can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

14      145.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its*

15  *Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated

16  by gradually decreasing the dose of medication during discontinuation" without mentioning any

17  hardships that might occur.[38] This publication was available on APF's website until the

18  organization dissolved in May 2012.

19      146.    Detailers for Janssen have told and continue to tell doctors in California, including

20  El Monte, that their patients would not experience withdrawal if they stopped using opioids.

21  **Deceptive Minimization of Opioid Withdrawal**

22      147.    The Manufacturer Defendants also deceptively minimized the significant symptoms

23  of opioid withdrawal—described in the 2016 CDC Guideline as including drug craving, anxiety,

24  insomnia, abdominal pain, vomiting, diarrhea, tremor, and rapid heartbeat—and grossly

25  understated the difficulty of tapering, particularly after long-term opioid use.

26      148.    Contrary to the Manufacturer Defendants' representations, the 2016 CDC Guideline

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[38] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 19, 2017).

61526108.1

- 37 -

COMPLAINT

recognizes that the duration of opioid use and the dosage of opioids prescribed should be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant withdrawal symptoms," because "physical dependence on opioids is an expected physiologic response in patients exposed to opioids for *more than a few days*." (Emphasis added.) The 2016 CDC Guideline states that "more than a few days of exposure to opioids significantly increases hazards" and "each day of unnecessary opioid use increases likelihood of physical dependence without adding benefit." The 2016 CDC Guideline further states that "tapering opioids can be especially challenging after years on high dosages because of physical and psychological dependence" and highlights the difficulties, including the need to carefully identify "a taper slow enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]" tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-quality studies comparing the effectiveness of different tapering protocols for use when opioid dosage is reduced or opioids are discontinued."

## Deceptive Claims that Opioid Dosages Could Be Increased without Added Risk

149. The Manufacturer Defendants also falsely claimed that doctors and patients could increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to patients at higher dosages. The ability to escalate dosages was critical to the Manufacturer Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants, are described below:

   a. On information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Upon information and belief, based on Actavis' acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

   b. Cephalon and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide

stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[39]

c.   Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d.   Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 endo Pharmaceuticals PM-0120), on Endo's website. In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased... You won't 'run out' of pain relief."[40]

e.   Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain medicines but omitted any discussion of risks of increased opioid dosages.

f.   On information and belief, through March 2015, Purdue's *In the Face of Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the patient's view, is a sufficient dosage of opioids, he or she should find another doctor who will.

g.   Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that dosage escalations are "sometimes necessary," even unlimited ones, but did not disclose the risks from high opioid dosages.[41]

h.   In 2007, Purdue sponsored a CME entitled "Overview of Management Options" that was available for CME credit. The CME was edited by a KOL and taught that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

i.   Seeking to overturn the criminal conviction of a doctor for illegally prescribing opioids, the Front Group APF and others argued to the United States Fourth Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[42]

j.   Purdue presented a 2015 paper at the College on the Problems of Drug Dependence challenging the correlation between opioid dosage and overdoes.

k.   On information and belief, Purdue's detailers have told doctors in California, including in El Monte that they should increase the dose of OxyContin, rather than the frequency of use, to address early failure.

150.   These claims conflict with the scientific evidence, as confirmed by the FDA and

---

[39] Available at, https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (last accessed December 19, 2017).

[40] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

[41] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 19, 2017).

[42] Brief of the APF et al. in support of Appellant, *United States v. Hurowitz*, No. 05-4474, at 9 (4th Cir. Sept. 8, 2005).

CDC. As the CDC explained in its 2016 Guideline, the "[b]enefits of high-dose opioids for chronic pain are not established" while the "risks for serious harms related to opioid therapy increase at higher opioid dosage." More specifically, the CDC explained that "there is now an established body of scientific evidence showing that overdose risk is increased at higher opioid dosages." The CDC also stated that there are "increased risks for opioid use disorder, respiratory depression, and death at higher dosages." This is why the CDC advised doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

151.    The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." In fact, a recent study found that 92% of persons who died from an opioid-related overdose were initially prescribed opioids for chronic pain.

### Deceptive Advertising of Abuse Deterrent Opioids

152.    The Manufacturer Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioid formulations also has created false impressions that these opioids can prevent and curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

153.    These abuse deterrent formulations (AD opioids) purportedly: (a) are harder to crush, chew, or grind; (b) become gelatinous when combined with a liquid, making them harder to inject; or (c) contain a counteragent such as naloxone that is activated if the tablets are tampered. Despite this, AD opioids can be defeated—often quickly and easily—by those determined to do so. The 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies—even when they work—do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes. Moreover, they do *not* reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term

COMPLAINT

as prescribed or who escalate their use by taking more pills or higher doses. Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction, overdoses, or death."[43]

154.    Because of these significant limitations on AD opioids, as well as the heightened risk for misconceptions and the false belief that AD opioids can be prescribed safely, the FDA has cautioned that "[a]ny communications from the sponsor companies regarding AD properties must be truthful and not misleading (based on a product's labeling), and supported by sound science taking into consideration the totality of the data for the particular drug. Claims for AD opioid products that are false, misleading, and/or insufficiently proven do not serve the public health."

155.    Despite this lack of evidence, the Manufacturer Defendants have made and continue to make misleading claims about the ability of their so-called abuse-deterrent opioid formulations to prevent or reduce abuse and addiction and the safety of these formulations.

156.    For example, Endo has marketed Opana ER[44] as tamper- or crush-resistant and less prone to misuse and abuse even though: (a) the FDA rejected Endo's petition to approve Orpana ER as abuse-deterrent in 2012; (b) the FDA warned in a 2013 letter that there was *no* evidence that Opana ER would provide a reduction in oral, intranasal or intravenous abuse; and (c) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground and chewed. Nonetheless, Endo's advertisements for the 2012 reformulation of Opana ER falsely claimed that it was designed to be crush resistant, in a way that suggested it was more difficult to abuse. Since 2012, Plaintiff is informed and believes that detailers for Endo have informed California doctors, including doctors in El Monte, that Opana ER is harder to abuse and given demonstrations to nurse practitioners about Opana ER's purported abuse deterrent properties.

---

[43] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity (Dec. 15, 2016), available at https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution (last accessed December 20, 2017).
[44] Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8, 2017 and requested that Endo withdraw Opana ER from the market. Press Release, "FDA requests removal of Opana ER for risks related to abuse," June 8, 2017, available at https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

157.    In its 2016 settlement with the NY AG, Endo agreed to no longer make statements in New York that Opana ER was "designed to be, or is crush resistant." The NY AG found those statements to be false and misleading because there was no difference in the ability to extract the narcotic from Opana ER. The NY AG also found that Endo failed to disclose its own knowledge of the crushability of redesigned Opana ER in its marketing to formulary committees and pharmacy benefit managers.

158.    Because Orpana ER could be "readily prepared for injection" and was linked to outbreaks of HIV and a serious blood disease, an FDA advisory committee recommended that Opana ER be withdrawn from the market in May 2017. The FDA adopted this recommendation on June 8, 2017, and requested that Endo withdraw Opana ER from the market.

159.    Likewise, Purdue has engaged and continues to engage in deceptive marketing of its AD opioids—i.e., reformulated Oxycontin and Hysingla. Before April 2013, Purdue did not market its opioids based on their abuse deterrent properties. However, Plaintiffs is informed and believes that beginning in 2013 and continuing today, detailers from Purdue regularly uses the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to differentiate Purdue's products from its competitors. Specifically, these detailers: (a) falsely claim that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (b) falsely claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less likely to yield a euphoric high, and are disfavored by opioid abusers; (c) falsely claim Purdue's AD opioids are "safer" than other opioids; and (d) fail to disclose that Purdue's AD opioids do not impact oral abuse or misuse, and that its abuse deterrent properties can be defeated.

160.    These statements and omissions by Purdue are false and misleading, and conflict with or are inconsistent with the FDA-approved label for Purdue's AD opioids, which indicates that (a) abusers seek them because of their high "likability" when snorted, (b) their abuse deterrent properties can be defeated, and (c) they can be abused orally notwithstanding their abuse deterrent properties. Notably, the FDA-approved label for Purdue's AD opioids does *not* indicate that AD opioids prevent or reduce abuse, misuse, or diversion.

161.    Purdue knew and should have known that reformulated OxyContin is not better at

61526108.1                                - 42 -

tamper resistance than the original OxyContin and is still regularly tampered with and abused. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, ***one-third*** of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[45] Despite this, J. David Haddox—the Vice President of Health Policy for Purdue—falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.[46]

162.     Testimony in litigation against Purdue and other evidence indicates that Purdue knew and should have known that "reformulated OxyContin is not better at tamper resistance than the original OxyContin" and is still regularly tampered with and abused. Websites and message boards used by drug abusers, such as bluelight.org and reddit, also report a variety of ways to tamper with OxyContin and Hysingla, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which the tablet has been dissolved. Even Purdue's own website describes a study it conducted that found continued abuse of OxyContin with so-called abuse deterrent properties. Finally, there are no studies indicating that Purdue's AD opioids are safer than any other opioid products.

163.     The development, marketing, and sale of AD opioids is a continuation of the Manufacturer Defendants' strategy of using misinformation to drive profit. The Manufacturer Defendants' claims that AD opioids are safe falsely assuage doctors' concerns about the toll caused by the explosion in opioid abuse, causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit in the prevention of opioid abuse.

164.     These false and misleading claims about the abuse deterrent properties of their

[45] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin" (2015) 72.5 *JAMA Psychiatry* 424-430.

[46] *See* Harrison Jacobs, *There is a big problem with the government's plan to stop the drug-overdose epidemic*, Business Insider (Mar. 14, 2016), available at http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3 (last accessed December 20, 2017).

61526108 1                                                     - 43 -

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1   opioids are especially troubling. First, Manufacturer Defendants are using these claims in a spurious

2   attempt to rehabilitate their image as responsible opioid manufacturers. Plaintiff is informed and

3   believes that Purdue has conveyed to prescribers that its sale of AD opioids is "atonement" for its

4   earlier sins (even though its true motive was to preserve the profits it otherwise would have lost

5   when its patent for OxyContin expired). Indeed, Purdue introduced its first AD opioid days before

6   its patent for its non-AD opioid would have expired. Purdue even petitioned the FDA to withdraw

7   its non-AD opioid as unsafe as a way to prevent generic competition. Second, these claims are

8   falsely assuaging doctors' concerns about the toll caused by the explosion in opioid prescriptions

9   and use, and encouraging doctors to prescribe AD opioids under the mistaken belief that these

10   opioids are safer, even though they are not. Finally, these claims are causing doctors to prescribe

11   more AD opioids, which are far more expensive than other opioid products even though they

12   provide little or no additional benefit in the prevention of opioid abuse.

13     165. These numerous, longstanding misrepresentations of the risks of long-term opioid

14   use spread by Defendants successfully convinced doctors and patients to discount those risks.

15     **D.** **The Manufacturer Defendants Misrepresented the Benefits of Chronic Opioid**

16      **Therapy**

17     166. To convince doctors and patients that opioids should be used to treat chronic pain,

18   the Manufacturer Defendants also had to persuade them that there was significant upside to long-

19   term opioid use.

20     167. The 2016 CDC Guideline makes clear, there is "***insufficient evidence*** to determine

21   long-term benefits of opioid therapy for chronic pain." (Emphasis added.) In fact, the CDC found

22   that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for

23   chronic pain with outcomes examined at least 1 year later (with most placebo-controlled

24   randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial

25   and less harmful than long-term opioid use.

26     168. In 2013, the FDA also stated that it was "not aware of adequate and well-controlled

27   studies of opioids use longer than 12 weeks."

28     169. Despite this, the Manufacturer Defendants falsely and misleadingly touted the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 44 -

benefits of long-term opioid use, and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have the Manufacturer Defendants failed to correct these false and misleading claims, but they have continued to make them today.

170.    For example, the Manufacturer Defendants falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants are described below:

a.   On information and belief, Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

b.   Endo distributed advertisements that claimed that the use of Opana ER for chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c.   On information and belief, Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d.   *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

e.   APF's Treatment Options: A Guide for People Living with Pain, sponsored by Cephalon and Purdue, counseled patients that opioids "give [pain patients] a quality of life we deserve." This publication is still available online.

f.   Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy.  The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

g.   Endo was the sole sponsor, through NIPC, of a series of non-credit educational programs titled Persistent Pain in the Older Patient, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

h.   On information and belief, Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

claiming that opioids allowed a patient to "continue to function." This video is still available today on YouTube.

i.  Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 is still available online today.

j.  In a 2015 video on Forbes.com[47] discussing the introduction of Hysingla ER, Purdue's Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including Purdue's opioids, to chronic pain patients' "quality of life," and complained that CDC statistics do not take into account that patients could be driven to suicide without pain relief.

k.  Purdue's, Endo's, Teva's and Janssen's sales representatives have conveyed and continue to convey to prescribers in California, including in El Monte, the message that opioids will improve patient function.

171.    The above claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is **no good evidence** that opioids improve pain or function with long-term use, and ... complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline, finding:

a.  "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . . ."

b.  "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained and whether function or quality of life improves with long-term opioid therapy."

c.  "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

172.    The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

---

[47] Matthew Harper, *Why Supposedly Abuse-Proof Pills Won't Stop Opioid Overdose Deaths*, Forbes (Apr. 17, 2015), available at https://www.forbes.com/sites/matthewharper/2015/04/17/why-supposedly-abuse-proof-pills-pill-wont-stop-opioid-overdose-deaths/#6a4e41f06ce1 (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

173.   The 2016 CDC Guideline was not the first time a federal agency repudiated the Manufacturer Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience … results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[48] And, in 2008 the FDA sent a warning letter to an opioid manufacturer, making it publicly clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

174.   The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, the Manufacturer Defendants frequently contrasted the lack of a ceiling dosage for opioids with the risks of a competing class of analgesics: over-the-counter nonsteroidal anti-inflammatories (or NSAIDs). The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from opioids.[49] The Manufacturer Defendants have overstated the number of deaths from NSAIDS and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the serious risks of opioids. Once again, these misrepresentations by the Manufacturer Defendants contravene pronouncements by and guidance from the FDA and CDC based on the scientific evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016 to state that opioids should only be used as a last resort "in patients for which alternative treatment options" like non-opioid drugs "are inadequate."  And the 2016 CDC Guideline states that NSAIDs, not opioids,

---

[48] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at http://wayback.archive-it.org/7993/20170111063027/http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm259240.htm (last accessed December 20, 2017).

[49] See, e.g., Case Challenges in Pain Management: Opioid Therapy for Chronic Pain (Endo) (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending opioids), available at http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (last accessed December 19, 2017).

61526108.1

- 47 -

should be the first-line treatment for chronic pain, particularly arthritis and lower back pain.

175.     In addition, Purdue has misleadingly promoted OxyContin as being unique among opioids in providing 12 continuous hours of pain relief with one dose. Plaintiff is informed and believes that Purdue's detailers have told prescribers in California within the last two years that OxyContin lasts 12 hours. In fact, OxyContin does not last for 12 hours, which is an indisputable fact that Purdue has known at all times relevant to this action. Upon information and belief, Purdue's own research shows that OxyContin wears off in under six hours in one quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets release approximately 40% of their active medicine immediately, after which release tapers. This triggers a powerful initial response, but provides little or no pain relief at the end of the dosing period, when less medicine is released. This phenomenon is known as "end of dose" failure, and the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it also makes OxyContin more dangerous because the declining pain relief patients experience toward the end of each dosing period drives them to take more OxyContin before the next dosing period begins, quickly increasing the amount of drug they are taking and spurring growing dependence.

176.     Cephalon deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for, or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Cephalon from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm.

177.     Despite this, Plaintiff is informed and believes that Cephalon conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.[50] As part of this

---

[50] *See* Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 million & Enter Plea To Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), available at https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html (last accessed December 21, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1                                    - 48 -

campaign, Cephalon used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer, chronic pain.

178.    Cephalon's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses. For example:

    a.  Cephalon paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

    b.  Upon information and belief, Cephalon's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

    c.  In December 2011, Cephalon widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

179.    Purdue's sales representatives have pressed doctors to prescribe its opioids in order to be rewarded with talks paid by Purdue. Plaintiff is informed and believes that Purdue sale representatives have told doctors that in California that they will no longer be asked to give paid talks unless they increase their prescribing of Purdue's drugs.

180.    Although the U.S. Drug Enforcement Agency (DEA) has repeatedly informed Purdue about its legal "obligation to design and operate a system to disclose ... suspicious orders of controlled substances" and to inform the DEA "of suspicious orders when discovered," Purdue unlawfully failed to report or address illicit and unlawful prescribing of its drugs despite knowing about it for years. *See* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823(e).

181.    For over a decade, Purdue has been able to track the distribution and prescribing of its opioids down to the retail and prescriber levels. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

thousands of doctors in California and could identify California doctors who displayed red flags for diversion, including doctors whose waiting rooms were overcrowded, parking lots had numerous out-of-state vehicles, and patients seemed young and healthy, or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.

182.   Incredibly, rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin—the same OxyContin that Purdue had promoted as less addictive—in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in five years of investigating suspicious pharmacies, Purdue failed to take action, including in circumstances where Purdue employees personally witnessed the diversion of its drugs. Purdue also failed to take action with prescribers. Despite its knowledge of illegal prescribing, Purdue did not report until years after law enforcement shut down a Los Angeles clinic that prescribed more than 1.1 million OxyContin tablets and that Purdue's district manager described internally as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of public health and safety.

183.   In 2016, the NY AG found that, between January 1, 2008 and March 7, 2015, Purdue's sales representatives failed to timely report suspicious prescribing and continued to detail those prescribers even after they were placed on a "no-call" list.

184.   As Dr. Mitchell Katz, director of the Los Angeles County Department of Health Services, said in a Los Angeles Times article, "Any drug company that has information about physicians potentially engaged in illegal prescribing or prescribing that is endangering people's lives has a responsibility to report it." The NY AG's settlement with Purdue specifically cited the company for failing to adequately address suspicious prescribing. Yet, on information and belief, Purdue continues to profit from the prescriptions by such prolific prescribers.

185.   Like Purdue, Endo has been cited for its failure to set up an effective system for identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the NY

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

AG found that Endo: (a) failed to require sales representatives to report signs of abuse, diversion, and inappropriate prescribing; (b) paid bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing; and (c) failed to prevent sales representatives from visiting prescribers whose suspicious conduct had caused them to be placed on a no-call list. The NY AG also found that, in certain cases where Endo's sales representatives detailed prescribers who were convicted of illegal prescribing of opioids, those representatives could have recognized potential signs of diversion and reported those prescribers but failed to do so.

186.    The Manufacturer Defendants made, promoted, and profited from their misrepresentations about the risks and benefits of opioids for chronic pain even though they knew that their misrepresentations were false and misleading. The history of opioids, as well as research and clinical experience over the last 20 years, established that opioids were highly addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer Defendants had access to scientific studies, detailed prescription data, and reports of adverse events, including reports of addiction, hospitalization, and deaths – all of which made clear the harms from long-term opioid use and that patients are suffering from addiction, overdoses, and death in alarming numbers. More recently, the FDA and CDC have issued pronouncements based on the medical evidence that conclusively expose the known falsity of the Manufacturer Defendants' misrepresentations, and Endo and Purdue have recently entered into agreements prohibiting them from making some of the same misrepresentations described in this Complaint.

187.    On information and belief, the Manufacturer Defendants coordinated their messaging through national and regional sales and speaker trainings and coordinated advertisements and marketing materials.

188.    Moreover, at all times relevant to this Complaint, the Manufacturer Defendants took steps to avoid detection of and to fraudulently conceal their deceptive marketing. For example, the Manufacturer Defendants disguised their own role in the deceptive marketing of chronic opioid therapy by funding and working through third parties like Front Groups and KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these individuals and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

organizations, and relied on them to vouch for the accuracy and integrity of the Manufacturer Defendants' false and misleading statements about the risks and benefits of long-term opioid use for chronic pain.

189.    Manufacturer Defendants also never disclosed their role in shaping, editing, and approving the content of information and materials disseminated by these third parties. Manufacturer Defendants exerted considerable influence on these promotional and "educational" materials in emails, correspondence, and meetings with KOLs, Front Groups, and public relations companies that were not, and have not yet become, public. For example, painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their own direct role.

190.    Finally, the Manufacturer Defendants manipulated their promotional materials and the scientific literature to make it appear that the information and materials disseminated by third parties were accurate, truthful, and supported by objective evidence when they were not. The Manufacturer Defendants distorted the meaning or import of studies they cited and offered them as evidence for propositions the studies did not support. The lack of support for the Manufacturer Defendants' deceptive messages was not apparent to medical professionals who relied upon them in making treatment decisions, nor could it have been detected by El Monte.

191.    The Manufacturer Defendants' efforts to artificially increase the number of opioid prescriptions directly and predictably caused a corresponding increase in opioid abuse. In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses."[51] Many abusers start with legitimate prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[52] Accordingly, the Manufacturer Defendants' false and misleading statements directly caused the current opioid epidemic. The Manufacturer Defendants'

---

[51] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, Morbidity and Mortality Wkly Rep. (Jan. 1, 2016), available at https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (last accessed December 20, 2017).
[52] *Id.*

misrepresentations deceived and continue to deceive doctors and patients in California, including in El Monte, about the risks and benefits of long-term opioid use. California doctors confirm this. Studies also reveal that many doctors and patients are not aware of or do not understand these risks and benefits. Indeed, patients often report that they were not warned they might become addicted to opioids prescribed to them. As reported in January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not told opioids were potentially addictive. Plaintiff is informed and believes that California residents were never told that they might become addicted to opioids when they started taking them, were told that they could easily stop using opioids, or were told that the opioids they were prescribed were less addictive than other opioids.

192.     Numerous doctors and substance abuse counselors in California note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic. Treatment centers in California report that they treat a significant percentage – i.e., as high as 80% – of patients for opioid addiction.

193.     The Manufacturer Defendants knew and should have known that their misrepresentations about the risks and benefits of long-term opioid use were false and misleading when they made them.

194.     The Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids caused and continue to cause doctors in California, including doctors in El Monte, to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia, rather than prescribing less addictive medications. Absent Manufacturers Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids to as many patients, and there would not have been as many opioids available for misuse and abuse or as much demand for those opioids.

195.     Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids have caused and continue to cause the prescribing and use of opioids to explode in California, including in El Monte. Opioids are the most common means of treatment for chronic pain; 20% of office visits now include the prescription of an opioid, and 4 million Americans per

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    year are prescribed a long-acting opioid.

2        196.    In California, including El Monte, Manufacturer Defendants' deceptive marketing

3    of the abuse-deterrent properties of their opioids during the past few years has been particularly

4    effective. For example, one survey reports that pain specialists were more likely to recognize that

5    OxyContin had abuse deterrent properties and to prescribe OxyContin specifically because of those

6    properties. Further, prescribers who knew of OxyContin's abuse deterrent properties were using

7    more of it than those who did not know it was an AD opioid. Although sales of AD opioids still

8    represent only a small fraction of opioids sold (less than 5% of all opioids sold in 2015), they

9    represent a disproportionate share of opioid sales revenue ($2.4 billion or approximately 25% in

10   opioid sales revenue in 2015).

11       197.    The dramatic increase in opioid prescriptions and use corresponds with the dramatic

12   increase in Manufacturer Defendants' spending on their deceptive marketing scheme. Manufacturer

13   Defendants' spending on opioid marketing totaled approximately $91 million in 2000. By 2011,

14   that spending had tripled to $288 million.

15       **E.    All Defendants Created an Illicit Market for Opioids**

16       198.    In addition to the allegations above, all Defendants played a role in the creation of

17   an illicit market for prescription opioids, further fueling the opioid epidemic.

18       199.    Defendants' distribution of opioids was driven by national policies, coordination,

19   plans, and procedures that were the same in California as they were across the rest of the United

20   States. Defendants worked together in an illicit enterprise, engaging in conduct that was not only

21   illegal, but in certain respects anti-competitive, with the common purpose and achievement of

22   vastly increasing their respective profits and revenues by exponentially expanding a market that the

23   law intended to restrict. At all relevant times, Defendants were in possession of national, regional,

24   state, and local prescriber- and patient-level data that allowed them to track prescribing patterns

25   over time. Defendants utilized this data to further their distribution scheme and to ensure the largest

26   possible financial return.

27       200.    Each participant in the supply chain shares the responsibility for controlling the

28   availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of

61526108.1                               - 54 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

prescription opioids is broken, allowing drugs to be transferred from a legitimate channel of distribution or use to an illegitimate channel of distribution or use.

201.    Diversion can occur at any point in the opioid supply chain.

202.    For example, diversion can occur at the wholesale level of distribution when distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency.

203.    Diversion can occur at pharmacies or retailers when a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose or not in the usual course of practice. Some of the signs that a prescription may have been issued for an illegitimate medical purpose include when the patient seeks to fill multiple prescriptions from different doctors (known as doctor shopping), when they travel great distances between the doctor or their residence and the pharmacy to get the prescription filled, when they present multiple prescriptions for the largest dose of more than one controlled substance, or when there are other "red flags" surrounding the transaction. These red flags should trigger closer scrutiny of the prescriptions by the pharmacy and lead to a decision that the patient is not seeking the medication to treat a legitimate medical condition.

204.    Diversion occurs through the use of stolen or forged prescriptions or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses. Opioids can also be diverted when stolen by employees or others.

205.    Opioid diversion occurs at an alarming rate in the United States.

206.    Each participant in the supply chain, including each Defendant, has a common law duty to prevent diversion by using reasonable care under the circumstances. This includes a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another is under a duty to exercise reasonable care to prevent the threatened harm.

207.    Defendants, and not Plaintiff, controlled the manufacture, marketing, and

distribution of prescription opioids within Plaintiff's boundaries. As such, Defendants were in the best position to protect Plaintiff and the public from the risk of harm of misuse of these products. Defendants owed Plaintiff a common law duty of care in light of that foreseeable risk.

208. Manufacturer Defendants owed Plaintiff a duty to exercise reasonable care in the promotion of prescription opioids in and around Plaintiff's boundaries. Defendants breached that duty in their misleading and inaccurate promotion of prescription opioids.

209. Distributor Defendants owed Plaintiff a duty to exercise reasonable care in the sale and distribution of opioids in and around Plaintiff's boundaries. Defendants breached that duty in their failure to prevent diversion of prescription opioids and in their refusal to report and halt suspicious orders.

**210.** In addition to their common law duties, Defendants possess duties under California law to develop and maintain a system to track suspicious orders of prescription opioids. Both Manufacturer and Distributor Defendants are subject to the reporting requirements of 16 CCR § 1782, and Distributor Defendants are further subject to California Business & Professions Code §§ 4164 and 4169.1.

211. Separately, Defendants also are subject to federal statutory requirements of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*. (the "CSA"), and its implementing regulations. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572.

212. Defendants' repeated and prolific violations of these requirements show that they have failed to meet the relevant standard of conduct that society expects of them: the duty to exercise reasonable care in the promotion of prescription opioids. In doing so, they acted with willful disregard for El Monte and the people therein.

213. California law requires Defendants to report suspicious orders of dangerous drugs subject to abuse, and to develop and maintain systems to detect and report such activity. This framework acts as a system of checks and balances from the manufacturing level through delivery of the controlled substance to the patient or ultimate user.

61526108.1                                    - 56 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

214.   Thus, all opioid distributors are required to maintain effective controls against opioid diversion. They are required to create and use a system to identify and report to the California State Board of Pharmacy downstream suspicious orders of controlled substances, such as orders of unusually large size, orders that are disproportionate, orders that deviate from a normal pattern, and/or orders of unusual frequency. To comply with these requirements, distributors must know their customers, must conduct due diligence, must report suspicious orders, and must terminate orders if there are indications of diversion.

215.   Moreover, every person or entity that manufactures, distributes, or dispenses opioids must obtain a registration with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA.

216.   Under the CSA, anyone authorized to handle controlled substances must track shipments. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from the point of manufacture through distribution to the point of sale. ARCOS accumulates data on distributors' controlled substances and transactions, which are then used to identify diversion. Each person or entity registered to distribute ARCOS reportable controlled substances, including opioids, must report each acquisition and distribution transaction to the DEA. *See* 21 U.S.C. § 827; 21 C.F.R. § 1304.33. Each registrant must also maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of.

217.   Plaintiff does not bring causes of action based on violations of federal statutes and regulations. However, the existence of these complicated regulatory schemes shows Defendants' intimate knowledge of the dangers of diversion of prescription opioids and the existence of a thriving illicit market for these drugs. Defendants breached their duties to Plaintiff despite this knowledge and longstanding regulatory guidance of how to deter and prevent diversion of prescription opioids.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1.     **The Distributor Defendants Negligently Failed to Control the Flow of Opioids to El Monte Through Illicit Channels**

218.    The Distributor Defendants have been and continue to be well-aware of problems posed by their failure to combat diversion of opioids. For example, the DEA has provided guidance to distributors on how to combat opioid diversion, and Plaintiff is informed and believes that the DEA has conducted one-on-one briefings with distributors regarding downstream customer sales, due diligence, and regulatory responsibilities since 2006. Plaintiff is further informed and believes that the DEA also provides distributors with data on controlled substance distribution patterns and trends, including data on the volume and frequency of orders and the percentage of controlled versus non-controlled purchases. The distributors are also given case studies, legal findings against other registrants, and ARCOS profiles of their customers whose previous purchases may have reflected suspicious ordering patterns. The DEA even pointed out "red flags" that the Distributor Defendants should look for in order to identify potential diversion.

219.    Since 2007, the DEA has hosted at least five conferences to provide registrants with updated information about diversion trends and regulatory changes that affect the drug supply chain, the distributor initiative, and suspicious order reporting. All of the major distributors, including McKesson, AmerisourceBergen, and Cardinal attended at least one of these conferences. The conferences allowed the registrants to ask questions and raise concerns. These registrants could also request clarification on DEA policies, procedures, and interpretations of the CSA and implementing regulations.

220.    Since 2008, the DEA also has participated in numerous meetings and events with the legacy Healthcare Distribution Management Association (HDMA), now known as the Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and distributors like McKesson, AmerisourceBergen, and Cardinal. DEA representatives have provided guidance to the association concerning suspicious order monitoring, and the association has published guidance documents for its members on suspicious order monitoring, reporting requirements, and the diversion of controlled substances. (HDMA, "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances,"

- 58 -

(2008).)

221.   On September 27, 2006, and December 27, 2007, the DEA Office of Diversion Control sent letters to all registered distributors providing guidance on suspicious order monitoring and the responsibilities and obligations of registrants to prevent diversion.

222.   On December 27, 2007, the Office of Diversion Control sent a follow-up letter to DEA registrants providing guidance and reinforcing the legal requirements outlined in the September 2006 correspondence. The December 2007 letter reminded registrants that suspicious orders must be reported when discovered and monthly transaction reports of excessive purchases did not meet the regulatory criteria for suspicious order reporting. The letter also advised registrants that they must perform an independent analysis of a suspicious order prior to the sale to determine if controlled substances would likely be diverted, and that filing a suspicious order and then completing the sale does not absolve the registrant from legal responsibility.

223.   Distributor Defendants' own industry group, the Healthcare Distribution Management Association, published Industry Compliance Guidelines titled "Reporting Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical role of each member of the supply chain in distributing controlled substances. These industry guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely situated to perform due diligence in order to help support the security of controlled substances they deliver to their customers."

224.   Opioid distributors have admitted to the magnitude of the problem and, at least superficially, their legal responsibility to prevent diversion. They have made statements assuring the public they supposedly are undertaking a duty to curb the opioid epidemic.

225.   For example, a Cardinal executive recently claimed that it uses "advanced analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."

226.   McKesson has publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and claimed it is "deeply passionate about curbing the opioid epidemic in our country."

COMPLAINT

227.   On their face, these assurances that they would identify and eliminate criminal activity and curb the opioid epidemic, create a duty for the Distributor Defendants to take reasonable measures to do just that.

228.   Despite their duties to prevent diversion, the Distributor Defendants have knowingly or negligently allowed diversion.[53]

229.   Their misconduct and negligent failure to prevent diversion is demonstrated by the fact that the DEA has been repeatedly forced to take action to force compliance, including (a) 178 registrant actions between 2008 and 2012, (b) 76 orders to show cause issued by the Office of Administrative Law Judges, and (c) 41 actions involving immediate suspension orders.[54] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

    a.  In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000;[55]

    b.  McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer;

[53] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post (Oct. 15, 2017), available at https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.75e86f3574d3 (last accessed December 21, 2017); Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post (Oct. 22, 2016), available at https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?tid=graphics-story&utm_term=.4f439ef106a8 (last accessed December 21, 2017).
[54] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), available at https://oig.justice.gov/reports/2014/e1403.pdf (last accessed January 8, 2018).
[55] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at https://www.justice.gov/opa/press-release/file/928476/download (last accessed December 21, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

c. On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion;

d. On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion;

e. On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion;

f. On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion;

g. In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States;[56]

h. On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion;

i. In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states;

j. In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act;[57]

k. On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year;

l. In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies; and

m. In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

[56] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post (Jan. 11, 2017), available at https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66 (last accessed December 21, 2017).
[57] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, available at https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-violations-controlled-substances-act (last accessed December 21, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

615261081

- 61 -

230.     Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

231.     The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which market extended to El Monte and its residents. Each Distributor Defendant knew or should have known that the opioids reaching El Monte were not being consumed for medical purposes and that the amount of opioids flowing to El Monte was far in excess of what could be consumed for medically necessary purposes.

232.     The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example: (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around El Monte; (e) providing information to pharmacies and retailers about opioid diversion; and (f) in general, simply following applicable statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

233.     On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around El Monte to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

234.     On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around El Monte, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

235.   It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around El Monte with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

236.   It was reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It was also reasonably foreseeable that many of these injuries would be suffered by El Monte residents, and that the costs of these injuries would be borne by El Monte.

237.   The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by El Monte, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

238.   The Distributor Defendants were aware of widespread prescription opioid abuse in and around El Monte, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas, in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

239.   The use of opioids by El Monte residents who were addicted or who did not have a medically necessary purpose could not have occurred without the knowing cooperation, assistance, or negligent failure to act of and by the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, El Monte and its residents would have avoided significant injury.

240.   The Distributor Defendants made substantial profits over the years based on the diversion of opioids into El Monte. The Distributor Defendants knew that El Monte would be unjustly forced to bear the costs of these injuries and damages.

241.   The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids showed an intentional or reckless disregard for the safety of El Monte and its residents. Their conduct poses a continuing threat to the health, safety, and welfare of El Monte.

242.   The state laws at issue here are public safety laws.

243.   The Distributor Defendants' violations constitute prima facie evidence of negligence under state law.

### 2.   The Manufacturer Defendants Negligently Failed to Control the Flow of Opioids to El Monte Through Illicit Channels

244.   The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under California law.

245.   In addition to a common law duty to exercise reasonable care in the promotion and marketing of opioids, the Manufacturer Defendants also are required to report all sales of dangerous drugs subject to abuse as designated by the California Board of Pharmacy in excess of amounts determined by the Board. *See* 16 CCR 1782.

246.   On information and belief, for over a decade the Manufacturer Defendants have been able to track the distribution and prescribing of their opioids down to the retail and prescriber level. Thus, the Manufacturer Defendants had actual knowledge of the prescribing practices of doctors, including red flags indicating diversion. The Manufacturer Defendants did not report those red flags, nor did they cease marketing to those doctors. Like the Distributor Defendants, the Manufacturer Defendants breached their duties under state law.

247.   The Manufacturer Defendants had access to and possession of the information necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors. A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the manufacturer's product at a price below a specified rate. After a distributor sells a manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled. The Manufacturer Defendants built receipt of this information into the payment structure for the opioids provided to the opioid distributors.

61526108.1                                   - 64 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

248.    The Manufacturer Defendants' actions and omission in failing to effectively prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the unlawful diversion of opioids into El Monte.

F.    **The Defendants Knowingly Profit from an Interstate Opioid Crisis**

249.    As the demand for prescription opioids grew, fueled by their potency and purity, interstate commerce flourished: opioids moved from areas of high supply to areas of high demand, traveling across state, city, and county lines in a variety of ways.

250.    First, prescriptions written in one state would, under some circumstances, be filled in a different state. But even more significantly, individuals transported opioids from one jurisdiction specifically to sell them in another.

251.    When authorities in one state cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role because its lack of regulatory oversight created a fertile ground for pill mills. Residents of many states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

252.    The facts surrounding numerous criminal prosecutions illustrate this common practice. For example, in May 2018 a mother son crime duo based out of New Jersey was caught flying to California in attempts to obtain additional sources of supply for their drug operation which consisted of trafficking counterfeit prescription pills, other opiates, cocaine and marijuana.[58]

253.    In another example, a man from Warren County, Ohio, who was sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and then sell them back home in Ohio for as much as $100 a pill—ten times the pharmacy price.[59] In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone

---

[58] *United States of America v. Candace Gottlieb*, Case No. 18-1015 (AMD), (D.N.J. May 30, 2018).

[59] Andrew Welsh-Huggins, Associated Press, *'Prescription Tourists' Thwart States' Crackdown on Illegal Sale of Painkillers*, NBC News, available at http://www.nbcnews.com/id/48111639/ns/us_news-crime_and_courts/t/prescription-tourists-thwart-states-crackdown-illegal-sale-painkillers/#.WtdyKE2Wy71 (last updated July 8, 2012, 12:28 PM).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

pipeline between Ohio and Florida."[60] When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash. In 2015, another Columbus man was sentenced for the same conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[61]

254.    Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states.[62] Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy. Again, many of those customers were from other states.[63]

255.    In yet another case, defendants who operated a pill mill in south Florida within Broward County were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations. As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits. To earn this sum required more business than the local market alone could provide. Indeed, only about half of the [Pain Center of Broward]'s customers came from Florida. Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts."[64] The court further noted that the

---

[60] *16 Charged in 'Pill Mill' Pipeline*, Columbus Dispatch (June 7, 2011), available at http://www.dispatch.com/content/stories/local/2011/06/07/16-charged-in-pill-mill-pipeline.html (last accessed July 25, 2018).

[61] Associated Press, Leader of Ohio Pill-Mill Trafficking Scheme Sentenced, Star Beacon (July 16, 2015), available at http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html (last accessed July 25, 2018).

[62] Press Release, U.S. Dep't of Just., U.S. Atty's Off., Northern District of Ga., *Four Defendants Plead Guilty to Operating a "Pill Mill" in Lilburn, Georgia* (May 14, 2015), available at https://www.justice.gov/usao-ndga/pr/four-defendants-plead-guilty-operating-pill-mill-lilburn-georgia (last accessed July 25, 2018).

[63] Press Release, U.S. Dep't of Just., U.S. Atty's Off., Northern District of Ga., Two Pharmacists Convicted for Illegally Dispensing to Patients of a Pill Mill (Mar. 29, 2017), available at https://gdna.georgia.gov/press-releases/2017-03-30/two-pharmacists-convicted-illegally-dispensing-patients-pill-mill (last accessed July 25, 2018).

[64] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by

2    Kentucky residents."[65]

3         256.   The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so

4    well traveled that it became known as the Blue Highway, a reference to the color of the 30mg

5    Roxicodone pills manufactured by Mallinckrodt.[66] Eventually, as police began to stop vehicles with

6    certain out-of-state tags cruising north on I-75, the prescription tourists adapted. They rented cars

7    just over the Georgia state line to avoid the telltale out-of-state tag.[67] If they were visiting multiple

8    pill mills on one trip, they would stop at FedEx between clinics to mail the pills home and avoid

9    the risk of being caught with multiple prescriptions if pulled over.[68] Or they avoided the roads

10   altogether: Allegiant Air, which offered several flights between Appalachia and Florida, was so

11   popular with drug couriers that it was nicknamed the "Oxy Express."[69]

12        257.   While the I-75 corridor was well utilized, prescription tourists also came from other

13   states. The director of the Georgia drugs and narcotics agency observed that visitors to Georgia pill

14   mills come from as far away as Arizona and Nebraska.[70]

15        258.   Similar pipelines developed in other regions of the country. For example, the I-95

16   corridor was another transport route for prescription pills. As the director of the Maine Drug

17   Enforcement Agency explained, the oxycodone in Maine was coming up extensively from Florida,

18   Georgia and California.[71] And, according to the FBI, Michigan plays an important role in the opioid

19   epidemic in other states; opioids prescribed in Michigan are often trafficked down to West Virginia,

20   Ohio, and Kentucky.

21

22   [65] *Id.* at 861.
     [66] John Temple, *American Pain, How a Young Felon and His Ring of Doctors Unleashed America's*
     *Deadliest Drug Epidemic* 171 (2016).

23   [67] *Id.* at 172
     [68] *Id.* at 171

24   [69] *Id.*
     [70] Andrew Welsh-Huggins, Associated Press, *'Prescription Tourists' Thwart States' Crackdown on Illegal*

25   *Sale of Painkillers*, NBC News, available at http://www.nbcnews.com/id/48111639/ns/usnews-
     crimeandcourts/t/prescription-tourists-thwart-states-crackdown-illegal-sale-painkillers/#.WtdyKE2Wy71

26   (last accessed July 25, 2018).
     [71] Nok-Noi Ricker, *Slaying of Florida firefighter in Maine Puts Focus on Interstate 95 Drug Running*,

27   Bangor Daily News (March 9, 2012), available at http://bangordailynews.com/
     2012/03/09/news/state/slaying-of-florida-firefighter-in-maine-puts-focus-on-interstate-95-drug-running

28   (last accessed July 25, 2018)

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

259.   Along the west coast, over a million pills were transported from the Lake Medical pain clinic in Los Angeles and cooperating pharmacies to the City of Everett, Washington.[72] Couriers drove up I-5 through California and Oregon, or flew from Los Angeles to Seattle.[73] The Everett-based dealer who received the pills from southern California wore a diamond necklace in the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram OxyContin—connecting Los Angeles and Washington state.

260.   Defendants certainly were aware, or should have been aware, that pill mills from around the country were pushing its products. Defendants purchased nationwide, regional, state, and local prescriber- and patient-level data from data vendors that allowed them to track prescribing trends, identify suspicious orders, identify patients who were doctor shopping, identify pill mills, etc. The data vendors' information purchased by the Defendants allowed them to view, analyze, compute, and track their competitors' sales, and to compare and analyze market share information.

261.   Similarly, Wolters Kluwer, an entity that eventually owned data mining companies that were created by McKesson (Source) and Cardinal Health (ArcLight), provided the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians, organized by territory, regarding competing drugs, and analyzed the market share of those drugs.

262.   Not only were Defendants aware of the pill mills, but Defendants' sales incentives rewarded sales representatives who happened to have pill mills within their territories, enticing those representatives to look the other way even when their in-person visits to such clinics should have raised numerous red flags. In one example, a pain clinic in South Carolina was diverting massive quantities of OxyContin. People traveled to the clinic from towns as far as 100 miles away to get prescriptions, the DEA's diversion unit raided the clinic, and prosecutors eventually filed criminal charges against the doctors. But Purdue's sales representative for that territory, Eric Wilson, continued to promote OxyContin sales at the clinic. He reportedly told another local physician that this clinic accounted for 40% of the OxyContin sales in his territory. At that time,

---

[72] Harriet Ryan et al., How Black-Market OxyContin Spurred a Town's Descent into Crime, Addiction and Heartbreak, Los Angeles Times (July 10, 2016), available at http://www.latimes.com/projects/la-me-oxycontin-everett/ (last accessed July 25, 2018)
[73] Id.

61526108.1

- 68 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Wilson was Purdue's top-ranked sales representative. In response to news stories about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing our medication inappropriately, such activity would continue regardless of whether we contacted the doctor or not.[74]

263. In another example, a Purdue sales manager informed her supervisors in 2009 about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic with her sales representative "it was packed with a line out the door, with people who looked like gang members," and that she felt "very certain that this an organized drug ring[.]"[75] She wrote, "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at Purdue responded that while they were "considering all angles," it was "really up to [the wholesaler] to make the report."[76] This pill mill was the source of 1.1 million pills trafficked to Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was shut down in 2010 to inform the authorities.

264. Abundant evidence, thus, establishes that prescription opioids migrated between states, counties, and cities and that Defendants were aware of it. As a result, Defendants' public nuisance is not limited to the local or state level, but is national in scope. Additionally, prescription data from any particular jurisdiction does not capture the full scope of the misuse, oversupply and diversion problem in that specific area. As the criminal prosecutions referenced above show, if prescription opioid pills were hard to get in one area, they migrated from another. The manufacturers and distributors were fully aware of this phenomenon and profited from it.

265. Defendants each knew or should have known that opioid diversion and abuse was occurring on a nationwide scale, and Defendants each profited from disregarding the nationwide illicit prescription opioid trade. In search of even greater profits, the Defendants facilitated and allowed to continue the unlawful diversion of opioids into El Monte.

---

[74] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* 204, 289-399 (Rodale 2003).

[75] Harriet Ryan *et al.*, *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, Los Angeles Time (July 10, 2016). http://www.latimes.com/projects/la-me-oxycontin-part2/. (last accessed July 30, 2018)

[76] *Id.*

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

### G.     Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages

266.    As the Manufacturer Defendants' efforts to expand the market for opioids increased, so have the rates of prescription and the sale of their products, as well as the rates of opioid-related substance abuse, hospitalization, and death among El Monte residents and across the nation. Meanwhile, the Distributor Defendants have continued to unlawfully ship massive quantities of opioids into communities like El Monte, fueling the epidemic.

267.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[77]

268.    Opioids are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[78]

269.    The epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[79]

270.    The increased abuse of prescription opioids—along with growing sales—has contributed to a large number of overdoses and deaths.

271.    As shown above, the opioid epidemic has escalated in El Monte with devastating effects. Substantial opiate-related substance abuse, hospitalization, and death mirror Defendants' increased distribution of opioids.

272.    Because of the well-established relationship between the use of prescription opioids and the use of non-prescription opioids, such as heroin, the massive distribution of opioids to El Monte and areas from which opioids are being diverted to El Monte, has caused the opioid epidemic to include heroin addiction, abuse, and death.

273.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in El Monte.

---

[77] *See* Richard C. Dart et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).
[78] Volkow & McLellan, *supra* note 1.
[79] Califf, *supra* note 2.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

274.    Heroin abuse, addiction, morbidity, and mortality are hazards to public health and safety in El Monte.

275.    Defendants repeatedly and purposefully breached their duties under state law, and such breaches are direct and proximate causes of, and/or substantial factors leading to, the widespread diversion of prescription opioids for nonmedical purposes in El Monte.

276.    The unlawful diversion of prescription opioids is a direct and proximate cause of, and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction, morbidity, and morality in El Monte. This diversion and the resulting epidemic are direct causes of foreseeable harms incurred by El Monte and residents of El Monte.

277.    Defendants' intentional and unlawful conduct resulted in direct and foreseeable, past and continuing, economic damages for which El Monte seeks relief, as alleged herein. El Monte also seeks the means to abate the epidemic created by the Defendants.

278.    El Monte seeks economic damages from the Defendants as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

279.    El Monte seeks economic damages from the Defendants to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

280.    El Monte seeks economic damages from the Defendants to pay for the reduction to tax revenues caused by the epidemic created by the Defendants.

281.    To eliminate the hazard to public health and safety, and abate the public nuisance, a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[80]

282.    A comprehensive response to this crisis must focus on preventing new cases of opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective opioid addiction treatment while safely meeting the need of patients experiencing pain.[81]

283.    The community-based problems require community-based solutions that have been

---

[80] Rudd, *supra* note 51.
[81] *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An Evidence-Based Approach* (G. Caleb Alexander et al., eds., 2015), available at https://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf (last accessed January 8, 2018).

61526108.1

- 71 -

limited by budgetary constraints.

284.    Having profited enormously through the aggressive sale, misleading promotion, and irresponsible distribution of opioids, Defendants should be required to take responsibility for the financial burdens their conduct has inflicted upon El Monte.

285.    The opioid epidemic still rages because the fines and suspensions imposed by the DEA do not change the conduct of the industry. The Defendants pay fines as a cost of doing business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

286.    The Defendants have abandoned their duties imposed by the law, taken advantage of a lack of DEA enforcement, and abused the privilege of distributing controlled substances in El Monte.

287.    In the course of conduct described in this Complaint, Defendants have acted with oppression, fraud, and malice, both actual and presumed.

**H.     The Impact of Opioid Abuse on El Monte**

288.    Defendants' creation, through false and misleading advertising and a failure to prevent diversion, of a virtually limitless opioid market has significantly harmed El Monte and resulted in an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that approximately 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

289.    As the FDA observed in 2016, the opioid epidemic is getting worse, not better. For example, the California Department of Public Health (CDPH) issued a Drug Overdose Health Alert on April 8, 2016 entitled "Fentanyl-Contaminated Street Norco." This alert described the report of 48 overdoses and at least 10 deaths over a 10-day period in Sacramento County that appear to be associated with the consumption of a counterfeit version of the prescription drug Norco (acetaminophen and hydrocodone) contaminated with fentanyl. In Los Angeles County, there has been a concerning increase in reported fentanyl-related deaths. While there were on average 40 fentanyl-related deaths reported each year from 2011-2013, there were 62 reported deaths in 2014. The Los Angeles County Department of Public Health (LAC DPH) is concerned about a further

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

increase in deaths due to the lethality of fentanyl and reports that it is being found in street drugs and in counterfeit prescription drugs. The deaths in Sacramento County further enhanced this concern. Meanwhile in Orange County, the 4,012 opioid overdoses between 2011 and 2015 resulted in more than 20,000 hospital days. Over the same period, over 1,200 people died from opioid-related overdoses, with 55% of those resulting from prescription opioids.

290.   Opioid deaths represent the tip of the iceberg. Hospital admissions and emergency room visits have also skyrocketed.[82]   For every opioid overdose death, there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 nonmedical users of opioids.[83]   And as reported in May 2016, in California, opioid overdoses resulting in hospital visits increased by 25% (accounting for population growth) from 2011 to 2014.

291.   Even El Monte's youngest residents bear the consequences of the opioid abuse epidemic fueled by Defendants' conduct. In 1992, only 2 percent of women admitted for drug treatment services during pregnancy abused opioids. By 2012, opioids were the most commonly abused substance by pregnant women, accounting for 38 percent of all drug treatment admissions.[84] Many El Monte women have become addicted to prescription opioids and have used these drugs during their pregnancies. As a result, many El Monte infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome ("NAS").[85]

292.   The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require

---

[82] Lisa Girion and Karen Kaplan, *Opioids prescribed by doctors led to 92,000 overdoses in ERs in one year*, LA Times (Oct. 27, 2014), available at http://beta.latimes.com/nation/la-sci-sn-opioid-overdose-prescription-hospital-er-20141026-story.html (last accessed December 21, 2017).

[83] Jennifer DuPuis, Associate Dir., Human Servs. Div., Fond du Lac Band of Lake Superior Chippewa, *The Opioid Crisis in Indian Country*, at 37, available at https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last accessed December 21, 2017); Gery P. Guy, Jr., et al., *Emergency Department Visits Involving Opioid Overdoses, US., 2010-2014*, Am. J. of Preventive Medicine (Jan. 2018), available at http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext (last accessed December 21, 2017).

[84] Naana Afua Jumah, *Rural, Pregnant and Opioid Dependent: A Systematic Review*, National Institutes of Health, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/ (last accessed December 21, 2017).

[85] Jean Y, Ko et al., *CDC Grand Rounds, Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, U.S. C.D.C. Morbidity and Mortality Weekly Report, available at https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf (last accessed December 21, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

an emergency evacuation for care to save the infant's life. Such emergency transportation can cost thousands of dollars for each occurrence.

293.    Many NAS infants have short-term and long-term developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

294.    Many of the parents of these children continue to relapse into prescription opioid use and abuse. As a result, many of these children are placed in foster care or adopted.

295.    Opioid addiction is now the primary reason that Californians seek substance abuse treatment, and admissions to drug treatment facilities in California more than doubled from 2006/2007 to 2010/2011. Addiction treatment centers indicate that many of their patients – for one facility in northern California, up to 90% – started on legal opioid prescriptions.

296.    The explosion in opioid prescriptions and use caused by Defendants has led to a public health crisis in California. California faces skyrocketing opioid addiction and opioid-related overdoses and deaths as well as devastating social and economic consequences. This public health crisis is a public nuisance because it "is injurious to health" and interferes "with the comfortable enjoyment of life and property" (Civ. Code, § 3479) and because it affects "entire communit[ies]" and "neighborhood[s]" and "any considerable number of persons" (id., § 3480). The effects of each Defendant's deceptive marketing and distribution scheme are catastrophic and are only getting worse.

297.    There is little doubt that each Defendant's deceptive marketing and distribution scheme has precipitated this public health crisis in California, including El Monte, by dramatically increasing opioid prescriptions and use. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids (the supply), while the widespread use of opioids has created a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

298.    The effects of Defendants' deceptive marketing and distribution scheme has further

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

impacted Plaintiff in a foreseeable way such that El Monte must devote increased resources to the burden of the addicted homeless who commit drug and property crimes, to feed their addiction. For example, tax dollars are required to maintain public safety of places where the addicted homeless attempt to congregate, including parks, schools and public lands. Tax dollars are required to fight the infectious diseases frequently carried by addicts, and particularly the addicted homeless. Hepatitis B and C, HIV, sexually transmitted disease and methicillin-resistant *Staphylococcus aureus* (MRSA) are spread by opioid abuse.

299.    Unscrupulous opioid rehabilitation businesses, including certain DOE Defendants, have recruited addicts nationally with false and misleading promises of the medically supervised rehabilitation to help addicts overcome their addiction. The promotion claimed that there was effective rehabilitation available in beautiful California communities. These for-profit rehabilitation businesses failed to provide proper rehabilitation facilities. Investigations revealed that many have provided substandard care including use of physicians who have had their license revoked, operating staffs which do not actually supervise patients, and facilities that do not operate programs for addicts. Instead these facilities bring addicts to California, provide substandard care as long as there are third party payments available, and then throw them out of the facilities to be homeless. These addicts brought to California by the substandard rehab industry, have further contributed to the public's burden by discharging addicted homeless into the community who require further care and rehabilitation at the public's expense, and who commit crimes in California in order to further feed their addiction. The manufacturer and distributor Defendants were aware at all relevant times when they deceptively marketed their products as non-addictive that such addiction would be highly difficult to overcome. Defendants knew or should have known that municipalities, including El Monte, would bear the burden of costs associated with rehabilitation business of all types.

300.    The role of Defendants' deceptive marketing and distribution scheme in causing this public health crisis has been well established. In her May 2014 testimony to the Senate Caucus on International Narcotics Control on behalf of the National Institutes of Health (NIH), Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely to have

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

contributed to the severity of the current prescription drug abuse problem." And in August 2016, the former U.S. Surgeon General expressly connected the "urgent health crisis" to "heavy marketing of opioids to doctors . . . . [m]any of [whom] were even taught – incorrectly – that opioids are not addictive when prescribed for legitimate pain." California doctors, addiction treatment specialists, and law enforcement and public health officials confirm that prescription opioids lawfully prescribed by doctors have fueled this epidemic.

301.    Absent each Defendant's deceptive marketing scheme and improper distribution, opioid prescribing, use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

302.    By falsely downplaying the risks and grossly exaggerating the benefits of long-term opioid use through their deceptive marketing claims despite their knowledge of the falsity of those claims, and by improperly distributing prescription opioids as set forth herein, Defendants have not only engaged in false advertising, they have also created or assisted in the creation of a public nuisance. Every act of malfeasance committed by each Defendant since the late 1990s to the present is part of its deceptive marketing and distribution scheme and subjects that Defendant to liability for public nuisance because there is no statute of limitations for a public nuisance claim. *See* Cal. Civ. Code § 3490 ("No lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right"); *Wade v. Campbell*, (1962) 200 Cal.App.2d 54, 61 ("the maintenance of a public nuisance may not be defended on the ground of laches or the statute of limitations").

303.    Accordingly, Defendants' conduct, both individually and collectively, has violated and continues to violate the False Advertising Law, Cal. Bus. & Prof. Code, §§ 17500 *et seq.*, and the Public Nuisance Law, Cal. Civ. Code, §§ 3479 and 3480. El Monte does not seek to limit the ability of doctors in California to prescribe opioids. El Monte does not ask this Court to weigh the risks and benefits of long-term opioid use. Instead, El Monte seeks an order requiring Defendants to cease their unlawful promotion and distribution of opioids, to correct their misrepresentations, and to abate the public nuisance they have created. To redress and punish Defendants' previous and current violations of law that cause and continue to cause harm to El Monte, Plaintiff seeks a judgment requiring Defendants to pay civil penalties, and any fees or costs permitted under law.

304.    By this action, El Monte further seeks to recoup tax dollars spent already for the consequences of Defendants' wrongful conduct in causing the opioid epidemic and crisis and its impact on this county and its communities, and to abate the opioid nuisance so El Monte will not be required to spend further taxpayer dollars on the epidemic and crisis wrought by Defendants' wrongful conduct as alleged herein.

305.    The rise in opioid addiction caused by Defendants' deceptive marketing scheme has also resulted in an explosion in heroin use. Almost 80% of those who used heroin in the past year previously abused prescription opioids. And as reported in May 2016, heroin overdose deaths in California spiked by 34% from 2011 to 2013.

306.    Opioid abuse also contributes to a range of social problems including physical and mental consequences, crime, delinquency, and mortality.  Other adverse social outcomes include child abuse and neglect, family dysfunction, criminal behavior, poverty, property damage, unemployment, and despair. More and more El Monte resources are needed to combat these problems. The prescription opioid crisis also diminishes El Monte's available workforce, decreases productivity, increases poverty, and requires greater governmental expenditures by El Monte.

307.    The prescription opioid crisis has directly financially injured El Monte. The crisis has led to an increased demand for, *inter alia*, security services (such as police, EMS, detention), child protective services, health services, clean-up services, and legal services. El Monte has also had to hire additional staff and expend additional resources to manage the demand.

308.    El Monte's medical services have seen an increase in opioid-related health problems among El Monte residents, including, but not limited to, infants born with opioid-related medical conditions. This has resulted in increased demand and increased expenses.

309.    El Monte has also suffered substantial financial damages in the form of lost productivity of El Monte employees and residents, lost economic activity, lost reputation and good will, and the lost opportunity for growth. These damages have been suffered and continue to be suffered directly by El Monte.

310.    Many patients who become addicted to opioids will lose their jobs. Some will lose their homes and their families. Some will get treatment and fewer will successfully complete it;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

many of those patients will relapse, returning to opioids or some other drug. Of those who continue to take opioids, some will overdose – some fatally, some not. Others will die prematurely from related causes – falling or getting into traffic accidents due to opioid-induced somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological disease.

311.    El Monte also has suffered substantial financial damages in the form of lost taxes paid by its residents and businesses as a result of lost earnings and productivity.

312.    While the use of opioids has taken an enormous toll on El Monte and its residents, Defendants have realized blockbuster profits. In 2014 alone, opioids generated $11 billion in revenue for drug companies like the Defendants. Indeed, on information and belief, each Defendant experienced a material increase in sales, revenue, and profits from the unlawful conduct described above.

## I.    The Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses

313.    Defendants' conduct has continued from the early 1990s through today and remains ongoing. The continued tortious and unlawful conduct by the Defendants has caused a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The tort is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants has not ceased. The public nuisance remains unabated.

314.    Defendants are equitably estopped from relying upon a statute of limitations defense because they undertook efforts to purposefully conceal their unlawful conduct and fraudulently assure the public that they were undertaking efforts to comply with their obligations under the controlled substances laws, all with the goal of continuing to generate profits.

315.    For example, a Cardinal Health executive claimed that it uses "advanced analytics" to monitor its supply chain, and assured the public it was being "as effective and efficient as

possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[86]

316.    Similarly, McKesson publicly stated that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders," and claimed it is "deeply passionate about curbing the opioid epidemic in our country."[87]

317.    Defendants, through their trade associations, filed an amicus brief that represented that Defendants took their duties seriously, complied with their statutory and regulatory responsibilities, and monitored suspicious orders using advanced technology.[88]

318.    Defendants purposely concealed their wrongful conduct, including by assuring the public and governmental authorities that they were complying with their obligations and were acting to prevent diversion and drug abuse. Defendants also misrepresented the impact of their behavior by providing the public with false information about opioids and have continued to use Front Groups and third parties to minimize the risks of Defendants' conduct. Defendants' conduct is continuing to this day.

319.    Defendants have also concealed and prevented discovery of information, including data from the ARCOS database, which will confirm their identities and the extent of their wrongful and illegal activities.

320.    Defendants also lobbied Congress and actively attempted to halt DEA investigations and enforcement actions and to subvert the ability of agencies to regulate their conduct.[89] As a result, there was a sharp drop in enforcement actions and the standard for the DEA to revoke a distributor's license was raised.

---

[86] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post (Oct. 22, 2016), available at https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html (last accessed December 21, 2017)

[87] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post, (Dec. 22, 2016), available at https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html (last accessed December 21, 2017).

[88] Br. for Healthcare Distribution Mgmt. Ass'n and Nat'l Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, Case No. 15-1335, 2016 WL 1321983, at *3-4, *25 (filed in the 2d Cir. Apr. 4, 2016).

[89] *See* Higham and Bernstein, *supra* note 53.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

321.   In addition, the Defendants fraudulently attempted to convince the public that they were complying with their legal obligations and working to curb the opioid epidemic.

322.   Because the Defendants concealed the facts surrounding the opioid epidemic, El Monte did not know if the existence or scope of the Defendants' misconduct, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

323.   Defendants intended that their false statements and omissions be relied upon, including by El Monte, and its residents.

324.   Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including El Monte, and its residents. Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid diversion.

325.   Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the claim. Indeed, the existence, extent, and damage of the opioid crisis have only recently come to light.

326.   Defendants had actual knowledge that their conduct was deceptive, and they intended it to be deceptive.

327.   El Monte was unable to obtain vital information regarding these claims absent any fault or lack of diligence on El Monte's part.

## V.   FACTS PERTAINING TO DEFENDANTS' CONSPIRACY

### A.   The Marketing Scheme

328.   Knowing that their opioids were highly addictive, ineffective, and unsafe for the treatment of long-term, chronic pain, non-acute, and non-cancer pain, Manufacturer Defendants conspired with the Front Groups and KOLs described above to engage in a scheme to increase their profits and sales unlawfully, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term, chronic pain. Through their personal relationships, the members of this marketing scheme had the opportunity to form and take actions in furtherance of their common purpose. The Manufacturer Defendants' substantial financial contribution to the marketing scheme, and the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

2       329.   The Manufacturer Defendants, through their marketing scheme, concealed the true

3    risks and dangers of opioids from the medical community and the public, including Plaintiff, and

4    made misleading statements and misrepresentations about opioids that downplayed the risk of

5    addiction and exaggerated the benefits of opioid use. The misleading statements included, among

6    others, that: (a) addiction is rare among patients taking opioids for pain; (b) addiction risk can be

7    effectively managed; (c) symptoms of addiction exhibited by opioid patients are actually symptoms

8    of an invented condition the Manufacturer Defendants named "pseudoaddiction"; (d) withdrawal

9    is easily managed; (e) increased dosing presents no significant risks; (f) long-term use of opioids

10   improves function; (g) the risks of alternative forms of pain treatment are greater than the adverse

11   effects of opioids; (h) use of time-released dosing prevents addiction; and (i) abuse-deterrent

12   formulations provide a solution to opioid abuse.

13      330.   The marketing scheme devised, implemented and conducted by the Manufacturer

14   Defendants was designed to ensure that they unlawfully increased their sales and profits through

15   concealment and misrepresentations about the addictive nature and effective use of their drugs. The

16   Manufacturer Defendants, the Front Groups, and the KOLs acted together for a common purpose

17   and perpetuated the marketing scheme, including through the unbranded promotion and marketing

18   network as described above.

19      331.   There was regular communication between the Manufacturer Defendants, Front

20   Groups and KOLs, in which information was shared, misrepresentations coordinated, and payments

21   exchanged. Typically, the coordination, communication and payment occurred, and continues to

22   occur, through the repeated and continuing use of the wires and mail in which the Manufacturer

23   Defendants, Front Groups, and KOLs share information regarding overcoming objections and

24   resistance to the use of opioids for chronic pain. The Manufacturer Defendants, Front Groups and

25   KOLs functioned as a continuing unit for the purpose of implementing the marketing scheme, and

26   each agreed and took actions to hide the scheme and continue its existence.

27      332.   At all relevant times, the Front Groups were aware of the Manufacturer Defendants'

28   conduct, were knowing and willing participants in and beneficiaries of that conduct. Each Front

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Group also knew, but did not disclose, that the other Front Groups were engaged in the same marketing scheme, to the detriment of consumers, prescribers, and Plaintiff. But for the Manufacturer Defendants, Front Groups and KOLs' unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Manufacturer Defendants and the marketing scheme to their members and constituents. By failing to disclose this information, Front Groups perpetuated the marketing scheme, and reaped substantial benefits.

333.    At all relevant times, the KOLs were aware of the Manufacturer Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The Manufacturer Defendants selected KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Manufacturer Defendants' support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Manufacturer Defendants by advancing their marketing goals. The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were engaged in the same marketing scheme, to the detriment of consumers, prescribers, and Plaintiff. But for the Manufacturer Defendants, Front Groups and KOLs' unlawful conduct, the KOLs would have had incentive to disclose the deceit by the Manufacturer Defendants and the marketing scheme, and to protect their patients and the patients of other physicians. By failing to disclose this information, KOLs furthered the marketing scheme, and reaped substantial benefits.

334.    As public scrutiny and media coverage focused on how opioids ravaged communities in California and throughout the United States, the Front Groups and KOLS did not challenge the Manufacturer Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the marketing scheme, nor disclose publicly the risks of using opioids for chronic pain.

335.    The Manufacturer Defendants, Front Groups and KOLs engaged in certain discrete categories of activities in furtherance of the marketing scheme. As described herein, the Manufacturer Defendants, Front Groups and KOLs' conduct in furtherance of the common purpose of the marketing scheme involved: (a) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (b) lobbying to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  defeat measures to restrict over-prescription; (c) efforts to criticize or undermine CDC guidelines;

2  and (d) efforts to limit prescriber accountability.

3      336.    In addition to disseminating misrepresentations about the risks and benefits of

4  opioids, Manufacturer Defendants, Front Groups and KOLs also furthered their common purpose

5  by criticizing or undermining CDC guidelines. Manufacturer Defendants, Front Groups and KOLs

6  criticized or undermined the CDC Guidelines which represented "an important step – and perhaps

7  the first major step from the federal government - toward limiting opioid prescriptions for chronic

8  pain."

9      337.    Several Front Groups, including the U.S. Pain Foundation and the AAPM, criticized

10  the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not

11  transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest

12  of the individuals who participated in the construction of these guidelines."

13      338.    The AAPM criticized the prescribing guidelines in 2016, through its immediate past

14  president, stating "that the CDC guideline makes disproportionately strong recommendations based

15  upon a narrowly selected portion of the available clinical evidence."

16      339.    The Manufacturer Defendants alone could not have accomplished the purpose of the

17  marketing scheme without the assistance of the Front Groups and KOLs, who were perceived as

18  "neutral" and more "scientific" than the Manufacturer Defendants themselves. Without the work

19  of the Front Groups and KOLs in spreading misrepresentations about opioids, the marketing

20  scheme could not have achieved its common purpose.

21      340.    The impact of the marketing scheme remains in place—i.e., the opioids continue to

22  be prescribed and used for chronic pain throughout El Monte, and the epidemic continues to injure

23  Plaintiff, and consume the resources of Plaintiff's emergency health services and law enforcement

24  systems.

25      341.    As a result, it is clear that the Manufacturer Defendants, the Front Groups, and the

26  KOLs were each willing participants in the marketing scheme, had a common purpose and interest

27  in the object of the scheme, and functioned within a structure designed to effectuate the scheme's

28  purpose.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

### B.     The Distribution Scheme

342.     Faced with the reality that they will now be held accountable for the consequences of the opioid epidemic they created, members of the industry resort to "a categorical denial of any criminal behavior or intent."[90] Defendants' actions went far beyond what could be considered ordinary business conduct. For more than a decade, the Distributor Defendants worked together in an illicit enterprise, engaging in conduct that was not only illegal, but in certain respects anti-competitive, with the common purpose and achievement of vastly increasing their respective profits and revenues by exponentially expanding a market that the law intended to restrict.

343.     Knowing that dangerous drugs have a limited place in our society, and that their dissemination and use must be vigilantly monitored and policed to prevent the harm that drug abuse and addiction causes to individuals, society and governments, California enacted California Business and Professions Code §§ 4164 and 4169.1, and adopted 16 CCR § 1782, which require Defendants to report suspicious orders of dangerous drugs subject to abuse and to maintain systems to detect and report such activity.

344.     If morality and the law did not suffice, competition dictates that the Distributor Defendants would turn in their rivals when they had reason to suspect suspicious activity. Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary business conduct dictates that it would do so.

345.     The Distributor Defendants' scheme required the participation of all. If any one member broke rank, its compliance activities would highlight deficiencies of the others, and the artificially high quotas they maintained through their scheme would crumble. But, if all the members of the enterprise conducted themselves in the same manner, it would be difficult for state authorities or the DEA to go after any one of them. Accordingly, through the connections they made as a result of their participation in the Healthcare Distribution Alliance ("HDA"), the

---

[90] McKesson Responds to Recent 60 Minutes Story About January 2017 Settlement With the Federal Government, McKesson, available at http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response (last visited Apr. 21, 2018).

61526108 1                                             - 84 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Distributor Defendants chose to flout the closed system designed to protect the citizens. Publicly, in 2008, they announced their formulation of "Industry Compliance Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances." But, privately, the Distributor Defendants refused to act. Indeed, despite the issuance of these Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as illustrated by the subsequent industry-wide enforcement actions and consent orders issued after that time, none of them complied. John Gray, President and CEO of the HDA said to Congress in 2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not inadvertently limiting access to appropriately prescribed and dispensed medications." Yet, the Distributor Defendants apparently all found the same profit-maximizing balance – intentionally remaining silent to ensure the largest possible financial return.

346.    As described above, at all relevant times, the Distributor Defendants conspired together for the purpose of unlawfully increasing sales, revenues and profits. In support of this common purpose and fraudulent scheme, the Distributor Defendants jointly agreed to disregard their statutory duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs into the illicit market so that those orders would not result in a decrease, or prevent an increase in, the necessary quotas.

347.    At all relevant times, as described above, the Distributor Defendants exerted control over, conducted and/or participated in distribution scheme by fraudulently claiming that they were complying with their duties under California law to report suspicious orders and to maintain systems to detect and report such activity.

348.    While participating in their distribution scheme, Distributor Defendants applied political pressure at the state and federal level to limit regulators' ability to quickly and effectively police suspicious drug shipments. As part of these efforts, the Distributor Defendants lobbied Congress to pass the "Ensuring Patient Access and Effective Drug Enforcement Act."[91]

---

[91] *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, available at http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-distribution-alliance/ (last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct. 22, 2016), available at https://www.w

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

349.   The Distributor Defendants knowingly and intentionally furnished false or fraudulent information in their reports to the DEA about suspicious orders, and/or omitted material information from reports, records and other document required to be filed with the California Board of Pharmacy and the DEA including the Manufacturer Defendants' applications for production quotas. Specifically, the Distributor Defendants were aware of suspicious orders of prescription opioids and the diversion of their prescription opioids into the illicit market, and failed to report this information to the California Board of Pharmacy and the DEA in their mandatory reports.

## VI.   MISCELLANEOUS FACTUAL ALLEGATIONS

350.   FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

351.   Defendants' causal role in the opioid epidemic was not broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants also were able to harness and hijack what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

352.   Each Defendant's conduct and role in creating or assisting in the creation of the public health crisis now plaguing California is directly relevant to the amount of the civil penalties to be awarded under California Business & Professions Code § 17536.

353.   As a members of the boards of various Purdue entities, the Sacklers oversaw all

ashingtonpost.com/investigations/the-dea-slowed-enforcement-while-the-  opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-8d13-  d7e704ef9fd9_story.html (last accessed December 21, 2017); Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis*, Wash. Post (Mar. 6, 2017), available at https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html (last accessed December 21, 2017); Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), available at http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills- (last accessed December 21, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

1    aspects of Purdue's marketing and promotion of opioid products. As board members who were

2    personally active in directing Purdue's operations, the Sackler Defendants knew, or should have

3    known, of Purdue's deceptive marketing tactics of opioid products.

4    354.   The Sackler Defendants also were aware of specific examples of deceptive

5    marketing through receipt of call note reviews in their capacities as board members. On information

6    and belief, the Sacklers received reports of opioid overdoses and reports of misuse and abuse in

7    their capacities as board members. Adverse event reports circulated to the Sacklers included reports

8    of abuse, addiction, withdrawal, overdoses, and deaths from OxyContin.

9    355.   The Sackler Defendants were personally aware that: (1) OxyContin was being

10   prescribed without proper care; (2) OxyContin was widely abused, including orally, and not just

11   through snorting or injecting; (3) Purdue failed to adequately disclose the risks of abuse and

12   diversion; and (4) OxyContin was wrongly, and dangerously, perceived as safer than morphine.

13   356.   By 2006, prosecutors at the United States Department of Justice found damning

14   evidence that Purdue intentionally deceived doctors and patients about its opioids. The Sacklers

15   voted that the Purdue Frederick Company should plead guilty to a felony for misbranding

16   OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause adverse

17   events and side effects than other pain medications.

18   357.   As members of the family that owns Purdue, the Sackler Defendants personally

19   benefitted from the success of OxyContin. At various points, as directors, they approved the

20   distribution of funds from Purdue to shareholders, including themselves and their extended family.

21   358.   Since at least 1999, the Sackler Defendants were aware of potential liability for

22   Purdue, as well as those acting in concert with Purdue, because of the addictive nature of Oxycontin.

23   Intending to shield the proceeds of their wrongdoing from creditors, the Sackler Defendants have

24   stripped Purdue each and every year of hundreds of millions of dollars of profits from the sale of

25   Oxycontin and other opioid-containing medications. All such transfers were and are fraudulent and

26   all such transferred funds should be clawed back from the Sackler Defendants in order to satisfy

27   the opioid related liabilities of the companies from which they were transferred.

28   359.   Plaintiff is informed and believes that due to the billions of dollars in profits that

61526108 1

- 87 -

COMPLAINT

1  have been distributed to the Sackler Defendants since the 1980's, Purdue lacks sufficient assets to

2  satisfy its liabilities to Plaintiff and to the multitude of other plaintiffs that have commenced

3  litigation against Purdue nationwide for its role in creating the opioid epidemic. Accordingly, the

4  Sackler Defendants have knowingly participated in the wrongdoing of Purdue, as well as knowingly

5  profited and received the benefits of that wrongdoing.

6  **VII.  CAUSES OF ACTION**

7  <u>**FIRST CAUSE OF ACTION**</u>

8  **(Public Nuisance – Cal. Civ. Code §§ 3479-3480 – Against All Defendants)**

9      360.    Plaintiff realleges and incorporates herein by reference each and every allegation in

10  paragraphs 1 through 359 above as if set forth fully herein.

11      361.    California Civil Code § 3479 provides that "anything which is injurious to health ...

12  or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to

13  interfere with the comfortable enjoyment of life or property ... is a nuisance."

14      362.    California Civil Code § 3480 defines a "public nuisance" as "one which affects at

15  the same time an entire community or neighborhood, or any considerable number of persons,

16  although the extent of the annoyance or damage inflicted upon individuals may be unequal."

17      363.    California Civil Code § 3490 states that "no lapse of time can legalize a public

18  nuisance, amounting to an actual obstruction of public right."

19      364.    Pursuant to § 731 of the California Code of Civil Procedure, this action is brought

20  by El Monte to abate the public nuisance created by the Defendants.

21      365.    Each Defendant, acting individually and in concert, has created or assisted in the

22  creation of a condition that is injurious to the health and interferes with the comfortable enjoyment

23  of life and property of entire communities or neighborhoods or of any considerable number of

24  persons in El Monte in violation of California Civil Code §§ 3479 and 3480.

25      366.    The public nuisance is substantial and unreasonable. Defendants' actions caused and

26  continue to cause the public health epidemic described above in El Monte, and that harm outweighs

27  any offsetting benefit.

28      367.    Defendants knew and should have known that their promotion and distribution of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

opioids was false and misleading and that their deceptive marketing scheme would create or assist in the creation of the public nuisance—i.e., the opioid epidemic.

368.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

369.    The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

370.    Each Defendant is liable for public nuisance because its conduct at issue is intentional, unreasonable, and unlawful, and has created an epidemic which annoys, injures or endangers the safety, health, morals, comfort, or repose of a considerable number of people in El Monte. Defendants' conduct is also indecent or offensive to the senses, and constitutes an obstruction to the free use of property sufficient to constitute an interference with the people of El Monte's comfortable enjoyment of life or property.

371.    As more fully alleged in the preceding Paragraphs of this Complaint, Defendants' intentional and deliberately deceptive marketing strategy to expand opioid use, together with their equally deliberate efforts to evade restrictions on opioid distribution has caused substantial and unreasonable interference with El Monte and its residents' public rights, including, but not limited to, the public's right to health, safety, welfare, peace, comfort, convenience, and ability to be free from disturbance and reasonable apprehension of danger to person or property.

372.    Specifically, Manufacturer Defendants intentionally, unlawfully, and unreasonably interfered with El Monte and its residents' public rights by, *inter alia*, engaging in a promotion and marketing scheme that pushed the use of opioids for indications not federally approved, and by circulating false and misleading information concerning their risks, benefits, and superiority, and/or downplaying or omitting the risk of addiction arising from their use. In so doing, Manufacturer

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1    Defendants failed to comply with federal law.

2        373.    Defendants have also unlawfully and intentionally distributed opioids or caused

3    opioids to be distributed within and without El Monte absent effective controls against diversion.

4    Such conduct was illegal, and proscribed by statute and regulation. Defendants' failures to maintain

5    effective controls against diversion include Defendants' failure to effectively monitor for

6    suspicious orders, report suspicious orders, and/or stop shipment of suspicious orders.

7        374.    Defendant's unreasonable interference with El Monte residents' public rights

8    include, but are not limited to, the effects of addiction, abuse, elevated crime, deaths, and increased

9    expenditures to combat and address these harms. These damages have been suffered and continue

10   to be suffered directly by El Monte and its residents.

11       375.    Defendants' actions have also created a palpable climate of fear, distress,

12   dysfunction and chaos among residents of El Monte where opioid diversion, abuse, and addiction

13   are prevalent and where diverted opioids are used frequently. Specifically, Defendants conduct has

14   caused, among other things, (a) routine separation of children from their parents who have fallen

15   victim to easy access to opioids and/or related crime; (b) children to have easy access and to become

16   addicted to opioids; (c) residents to endure both the emotional and financial costs of caring for

17   loved ones addicted to or injured by opioids; (d) increased crime and/or destruction of public spaces

18   and property; (e) property crimes throughout El Monte; (f) employers to lose the value of

19   productive and healthy employees; (g) increased public health and safety costs; (h) a reduction in

20   potential property values within El Monte; and (i) a decrease in tax revenues for El Monte.

21       376.    The impact of Defendants' conduct on El Monte is of a continuing nature.

22   Defendants' conduct will undoubtedly continue to cause long-lasting effects on their public rights.

23       377.    Defendants knew or should have known that their actions would lead to the national

24   opioid epidemic and to the resulting injuries to the public rights of El Monte.

25       378.    El Monte has sustained a special and peculiar injury because its damages include,

26   *inter alia*, health service expenditures, public safety expenditures, payment of opioid addiction

27   treatment, decreased tax revenues, a reduction in potential property values, and other costs related

28   to opioid addiction treatment and overdose prevention.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

379.    The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

380.    Defendants' actions are a direct and proximate contributing cause of the opioid epidemic and the injuries to the public rights of El Monte and its residents.

381.    Defendants, individually and collectively, are at the very least, a substantial factor in causing the national opioid epidemic and of the injuries to El Monte and its residents.

382.    The injuries to the public rights of El Monte and its residents are indivisible injuries.

383.    Defendants' manufacture, marketing, distribution, and sale of prescription opioids, if unabated, will continue to cause an unreasonable interference with public rights of El Monte and its residents.

384.    Defendants' conduct is ongoing and persistent, and El Monte seeks all damages flowing from Defendants' conduct. El Monte seeks economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from Defendants' illegal and wrongful conduct described above. El Monte does not seek damages for the wrongful death, physical personal injury, or emotional distress caused by Defendants' actions.

385.    Pursuant to Code of Civil Procedure § 731, El Monte requests an order providing for abatement of the public nuisance that Defendants created or assisted in the creation of, and enjoining Defendants from future violations of Civil Code §§ 3479 and 3480.

## SECOND CAUSE OF ACTION
### (Fraud – Against All Defendants)

386.    Plaintiff realleges and incorporates herein by reference each and every allegation in paragraphs 1 through 385 above as if set forth fully herein.

387.    Plaintiff realleges and incorporates by reference the foregoing allegations as if set forth herein

388.    The Defendants made fraudulent misrepresentations and omissions of material fact. Defendants' knowing deceptions during the relevant period, more fully described in this Complaint, were intended to induce reliance.

389.    Those misrepresentations and omissions were known to be untrue by the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

Defendants, or were recklessly made.

390.    As alleged herein, the Manufacturer Defendants engaged in false representations and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain, the dangers of abuse, and the risks of addiction.

391.    As alleged herein, Defendants made false statements and/or omissions regarding their compliance with state law regarding their duties to prevent diversion, their duties to monitor, report and halt suspicious orders, and/or concealed their noncompliance with these requirements. Defendants also failed to disclose the prevalence of diversion of controlled substances, including opioids, within El Monte.

392.    Defendants made those misrepresentations and omissions in an intentional effort to deceive El Monte and its residents, despite the Defendants' knowledge of the dangers of such use of prescription opioids.

393.    In addition and independently, Defendants had a duty not to deceive Plaintiff because Defendants had in their possession unique material knowledge that was unknown, and not knowable, to Plaintiff, Plaintiff's agents, physicians, and the public.

394.    The Defendants continued making those misrepresentations, and failed to correct those material omissions, despite repeated regulatory settlements and publications demonstrating the false and misleading nature of the Defendants' omissions and/or claims.

395.    While Defendants had a duty to disclose the above-referenced material facts, they nevertheless concealed them. These false representations and concealed facts were material to the conduct and actions at issue. Defendants made these false representations and concealed facts with knowledge of the falsity of their representations and did so with the intent of misleading El Monte, its residents, the public, and persons on whom these entities relied.

396.    Defendants intended and had reason to expect under the operative circumstances that Plaintiff, Plaintiff's agents, physicians, the public, and persons on whom Plaintiff and its agents relied would be deceived by Defendants' statements, concealments, and conduct as alleged herein and that these entities would act or fail to act in reasonable reliance thereon.

397.    El Monte, its residents, and others, did in fact rightfully, reasonably, and justifiably

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

1  rely on Defendants' representations and/or concealments, both directly and indirectly.

2      398.    For instance, doctors, including those serving El Monte and its residents, relied on

3  the Defendants' misrepresentations and omissions in prescribing opioids for chronic pain relief.

4  Patients, including residents of El Monte, relied on the Defendants' misrepresentations and

5  omissions in taking prescription opioids for chronic pain relief.

6      399.    Also, as a result of these representations and/or omissions, Plaintiff proceeded under

7  the misapprehension that the opioid crisis was simply a result of conduct by persons other than

8  Defendants. As a consequence, these Defendants prevented Plaintiff from a more timely and

9  effective response to the opioid crisis.

10      400.    Defendants' misconduct alleged in this case is ongoing and persistent.

11      401.    El Monte has experienced an unprecedented opioid addiction and overdose

12  epidemic leading to increased costs for, *inter alia*, emergency services, treatment services, security

13  services, and lost productivity to El Monte's workforce.

14      402.    The injuries alleged by Plaintiff herein were sustained as a direct and proximate

15  result of Defendants' fraudulent conduct.

16      403.    As a direct and foreseeable consequence of Defendants' fraud, El Monte has

17  incurred and continues to incur damages in an amount to be proved at trial consisting of costs for

18  opioid addiction treatment and its secondary consequences in excess of those El Monte would have

19  otherwise incurred.

20      404.    As alleged herein, Defendants' fraud was willful, malicious, oppressive, and

21  fraudulent, entitling El Monte to punitive damages.

22                **THIRD CAUSE OF ACTION**
**(Negligence – Against All Defendants)**

23

24      405.    Plaintiff realleges and incorporates herein by reference each and every allegation in

25  paragraphs 1 through 404 above as if set forth fully herein.

26      406.    To establish actionable negligence in California, Plaintiff must show a duty, a breach

27  of that duty, and injury resulting proximately therefrom.

28      407.    Defendants have a duty to exercise reasonable care under the circumstances, in light

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1

- 93 -

of the risks. This includes a duty not to cause foreseeable harm to others. In addition, these Defendants, having engaged in conduct that created an unreasonable risk of harm to others, had, and still have, a duty to exercise reasonable care to prevent the threatened harm.

408.   In addition, Defendants had a duty not to breach the standard of care established under California law, including 16 CCR § 1782 and California Business and Professions Code §§ 4164 and 4169.1, which require Defendants to report suspicious orders of dangerous drugs subject to abuse, and to develop and maintain systems to detect and report such activity.

409.   Defendants voluntarily undertook a legal duty to prevent the diversion of prescription opioids by engaging in the distribution of prescription opioids and by making public promises to prevent the diversion of prescription opioids.

410.   Defendants knew of the serious problem posed by prescription opioid diversion and were under a legal obligation to take reasonable steps to prevent diversion.

411.   Defendants knew of the highly addictive nature of prescription opioids and of the high likelihood of foreseeable harm to patients and communities, including El Monte, from prescription opioid diversion.

412.   Defendants had a legal duty to exercise reasonable and ordinary care and skill and in accordance with applicable standards of conduct in advertising, marketing, selling, and distributing opioid products in a safe manner to minimize the risk of addiction in patients and resultant harm to those patients, their families and their communities, and to taxpayers and municipal government such as El Monte which must incur enormous expenditures for prevention, treatment, emergency response and law enforcement costs and other foreseeable costs related to the need to address the consequences of a large number of residents that become addicted to opioids as a result of Defendants' conduct.

413.   As described throughout the Complaint, Defendants breached their duties to exercise due care in the business of wholesale distribution of dangerous opioids by failing to monitor for, failing to report, and filling highly suspicious orders time and again.

414.   As described throughout the Complaint, in language expressly incorporated herein, Defendants misrepresented their compliance with their duties under the law and concealed their

- 94 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

noncompliance and shipments of suspicious orders of opioids to El Monte and destinations from which they knew opioids were likely to be diverted into El Monte, in addition to other misrepresentations alleged and incorporated herein.

415. The Manufacturer Defendants breached their duty to Plaintiff by deceptively marketing opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain.

416. Manufacturer Defendants knew or should have known, that their affirmative misconduct in engaging in an aggressive, widespread, and misleading campaign in marketing narcotic drugs created an unreasonable risk of harm. The Defendants' sales data, reports from sales representatives, and internal documents, should have put them on notice that such harm was not only foreseeable, but was actually occurring. Defendants nevertheless chose to deceptively withhold or downplay information about the dangers of opioids from Plaintiff, physicians, patients, and the public.

417. Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

418. Defendants' misconduct alleged in this case is ongoing and persistent.

419. Defendants acted with actual malice in repeatedly breaching their duties—i.e., they acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

420. As is described throughout this Complaint, Defendants acted without even slight diligence or scant care, and with indifference, and were negligent in a very high degree, disregarding the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

421. Defendants' misconduct further meets the criteria set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113, for imposing on Defendants a duty to exercise ordinary care and skill in the in advertising, marketing, selling and distributing opioid products in a safe manner to minimize the risk of addiction in patients and resultant harm to those patients, their families and their communities, and to taxpayers and municipal government such as El Monte, including, but

- 95 -

not limited to, the following:

    a.   Foreseeability of harm to El Monte: Defendants were aware or reasonably should have been aware of the risk of addiction of a large number of patients in places such as El Monte, and need for their care and treatment and in handling other consequences of their addiction and that such costs would be borne by local governments such as El Monte;

    b.   Degree of certainty El Monte suffered harm: El Monte has suffered enormous harm and costs in addressing treatment of addicted patients, including but not limited to expenditures for prevention, treatment, emergency response and law enforcement costs and other foreseeable costs related to the need to address the consequences of a large number of residents that become addicted to opioids as a result of Defendants' conduct;

    c.   Closeness of connection between El Monte's harm: The explosion of opioid addiction and the presence of opioid addicted patients in El Monte as a result of Defendants' conduct has resulted in expenditures directly for prevention, treatment, emergency response and law enforcement costs and other foreseeable costs related to the need to address the consequences;

    d.   Moral blame attached to Defendants' conduct: Defendants' knew or should have known that their wrongful conduct, actions and omissions would result in an explosion of patients who would become addicted to opioids, and that a vast opioid epidemic would result from the prescription of opioids to tens of millions of patients nationwide, including within El Monte, and that the costs would be borne by the state, county and municipal local governments, while Defendants

61526108 1

COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

profited tens of billions of dollars collectively from the widespread use of prescription opioid products;

e. Policy of preventing future harm: As a direct and foreseeable result of Defendants' wrongful conduct, the opioid epidemic and crisis has and continues to occur on a vast scale both nationally and locally in places such as El Monte resulting in tremendous harm and cost to the patients, their families and the communities in dealing with this epidemic and crisis, and there is a need to ensure that the costs of such wrongful conduct is borne by Defendants so that parties contemplating such or similar conduct in the future know they will be held responsible for such harm;

f. Extent of burden to Defendants: There is no burden to Defendants in that state and other law precludes them from engaging in the conduct alleged herein, and there is no burden from precluding Defendants from profiting from their wrongful conduct and operating within the confines of the law in advertising, marketing, selling and distributing opioid products in a safe manner to minimize the risk of addiction in patients and resultant harm to those patients, their families and their communities, and to taxpayers and municipal government such as Plaintiff El Monte; and

g. Consequences to the community of imposing a duty to exercise care with resulting liability for breach: Imposing a duty to not engage in Defendants' wrongful conduct of advertising, marketing, selling and distributing opioid products in an unsafe manner would minimize the risk of addiction in patients, and liability for a breach of this duty would benefit communities such as El

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

61526108.1

- 97 -

Monte in that they would not have to incur the foreseeable costs of the opioid epidemic gripping the country and the nation.

422.   Plaintiff is not asserting a cause of action under the CSA or other federal controlled substances laws cited above.

423.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and will continue to suffer economic damages including, but not limited to, significant expenses for security services, emergency, health, prosecution, corrections, and rehabilitation services, as well as the cost of opioid addiction treatment paid by El Monte.

424.   As a direct and proximate result of Defendants' negligence, Plaintiff has suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

425.   Defendants' breaches of their duty of care foreseeably and proximately caused damage to El Monte and its residents.

426.   Manufacturer Defendants are guilty of negligence per se in that the Defendants violated applicable California laws, statutes, and regulations, in the manner in which they advertised, marketed, sold and distributed opioid products.

427.   Distributor Defendants are guilty of negligence per se in that the Defendants violated California laws, statutes, and regulations designed to protect Plaintiff from the harms it has suffered, including, but not limited to, the following:

    a.   Defendants falsely advertised opioids in violation of the Sherman Food, Drug, and Cosmetic Laws, California Health & Safety Code § 110390;

    b.   Defendants manufactured, sold, delivered, held, or offered for sale opioids that had been falsely advertised in violation of the Sherman Food, Drug, and Cosmetic Laws, California Health & Safety Code § 110395;

    c.   Defendants received in commerce opioids that were falsely advertised or delivered or proffered for delivery opioids that were falsely advertised in

COMPLAINT